199 N.J. Super. 307 (1985)
489 A.2d 704
MAYO S. SISLER, PLAINTIFF-RESPONDENT, AND MAYO S. SISLER AND APT-TO-ACRES, INC., PLAINTIFFS-CROSS-APPELLANTS,
v.
COURIER-NEWS CO. AND SAM MEDDIS, DEFENDANTS-APPELLANTS, AND COURIER-NEWS CO., SAM MEDDIS AND GANNETT COMPANY, INC., DEFENDANT-CROSS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued December 17, 1984.
Decided February 19, 1985.
*309 Before Judges McELROY, DREIER and SHEBELL.
John B. McCrory argued the cause for appellants Courier-News Co. and Sam Meddis (Herold, Ragsdale, Haines & McGowan, attorneys; John B. McCrory, Robert C. Bernius and Richard A. Ragsdale, on the brief).
Richard H. Thiele argued the cause for respondent Mayo S. Sisler (Thiele & Hermes, attorneys; Robert H. Thiele, on the brief).
Thomas J. Cafferty argued the cause amicus curiae for The New Jersey Press Association (McGimpsey & Cafferty, attorneys; Thomas J. Cafferty, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
Defendants, Courier-News Co. Inc. (Courier News) and one of its reporters, Sam Meddis (Meddis), have appealed from a jury award to plaintiff for compensatory damages in the amount of $200,000 for injuries to plaintiff's reputation, and an additional $850,000 for plaintiff's financial losses resulting from such damage to his reputation. Judge Robert E. Gaynor during this month-long libel trial ruled that defendants' conduct would be measured by a negligence standard, after determining that plaintiff was a nonpublic figure, and that the damage to his reputation could be compensable to him even though its effects were felt through the vehicle of a wholly-owned corporation *310 which itself was not libeled. We agree with each of these conclusions.
Plaintiff came to New Jersey from Maryland in 1951, and about three years later he and his brother organized a construction company called Sisler Brothers. In the late 1950's he was elected to the Franklin Township Committee and a year later unsuccessfully ran for Somerset County Freeholder. He then withdrew from political activity. Shortly thereafter plaintiff, with a group of local businessmen, helped organize the Franklin State Bank in Franklin Township, and plaintiff was elected as the bank's first president. After serving in that capacity for approximately 8 years, he was elected Chairman of the Board, serving in that office until early 1980.
Since approximately 1970 plaintiff also has been involved in the business of breeding standardbred racehorses. He initially bought a 60-acre farm near the Freehold Racetrack which he expanded through the 1970's until his horse farm in Manalapan Township, Apt-to-Acres, consisted of approximately 240 acres.
In 1976 he left the construction business, and upon retiring as Chairman of the Board of Franklin State Bank in 1980, he devoted his full time efforts to his horse farm.
Defendants contended that plaintiff was a public figure or limited public figure within the meaning of New York Times Co. v. Sullivan, 376 U.S. 254, 279-280, 84 S.Ct. 710, 725-726, 11 L.Ed.2d 686, 706 (1964); Gertz v. Welch, 418 U.S. 323, 332, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789, 800-801, 807 (1974) and Waldbaum v. Fairchild Publications Inc., 627 F.2d 1287 (D.C. Cir.) cert. den. 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980). They relied upon a series of newspaper articles published between 1958 and 1980 in which plaintiff was mentioned. The early articles concerned plaintiff's candidacy for Somerset County Freeholder in 1958 and his involvement as a leader in the Somerset County Democratic Committee. The articles published in the early 1960's discussed the founding of the Franklin State Bank wherein plaintiff is mentioned as a spokesman for *311 the bank in the context of its inception and growth. Subsequent articles in the New Brunswick Home News mentioned plaintiff as the Franklin State Bank expanded in the later 1960's and 1970's.
Another group of articles concerned a dispute between plaintiff and the Franklin Township Board of Adjustment when the Board rejected plaintiff's plan to build an apartment and shopping development in 1967, and his contentions in a subsequent lawsuit against the Township that his development plan had been rejected for political reasons.
Additional newspaper articles involved a 1972 tax appeal brought by a Franklin Township taxpayers' association, where the taxpayers sought an increase in the assessed value of the Sisler Building, an office building owned by plaintiff's construction company. Plaintiff subsequently filed a libel suit against the taxpayers' association. The newspapers reporting on the suit denominated plaintiff as "a prominent Franklin businessman." A Courier-News article concerning the suit published May 2, 1975 was written by defendant Meddis and indicated that the libel suit was settled by the parties. The assessment battle was not resolved until March 1979.

I
Judge Gaynor found that plaintiff's brief career as a local politician did not as of the time of the trial make him a household name in the community or give him fame or notoriety. In the language of Lawrence v. Bauer Pub. & Print. Ltd., 89 N.J. 451, 463, cert. den. 459 U.S. 999, 103 S.Ct. 358, 74 L.Ed.2d 395 (1982), plaintiff did not possess "the requisite `pervasive fame or notoriety'" (quoting Gertz, 418 U.S. at 352, 94 S.Ct. at 3013). His political career had ended in the early 1960's and defendants failed to show that any notoriety survived until the present controversy. Applying the standards of Waldbaum v. Fairchild Publications Inc., 627 F.2d at 1295-1296, *312 Judge Gaynor found that plaintiff was not a public figure for all purposes.
The judge then considered whether plaintiff could be a limited or semi-public figure, requiring the court to examine the nature and extent of the individual's participation in the particular controversy which gave rise to the defamation. Gertz v. Welch, 418 U.S. at 352, 94 S.Ct. at 3013. Judge Gaynor found that the investigation which was the subject matter of the allegedly defamatory articles did not create a public controversy or, even if it did there was no evidence that plaintiff assumed a voluntary active role in it or sought to influence public opinion. Lawrence, 89 N.J. at 464; see also Waldbaum, 627 F.2d at 1296.
After a careful review of all the evidence, Judge Gaynor determined that the status of the plaintiff was a question properly resolved by the court rather than the jury. Lawrence, 89 N.J. at 462; Gomez v. Murdock, 193 N.J. Super. 595, 599 (App.Div. 1984). He held that plaintiff was a private individual with respect to the allegedly defamatory articles. Judge Gaynor properly analyzed both the controversy and plaintiff's role in the controversy before concluding that plaintiff was not a public figure either for general purposes or a limited purpose. We affirm that determination.

II
Having determined plaintiff's status as a private individual, Judge Gaynor next established the standard of conduct to which defendants would be held. In Gertz v. Welch, the United States Supreme Court stated:
[s]o long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual. [418 U.S. at 347, 94 S.Ct. at 3010].
The Restatement, Torts 2d, § 580B (1976), adopted the negligence standard:
§ 580B. Defamation of Private Person

*313 One who publishes a false and defamatory communication concerning a private person, ... is subject to liability, if, but only if, he
(a) knows that the statement is false and that it defames the other,
(b) acts in reckless disregard of these matters, or
(c) acts negligently in failing to ascertain them.
Comment g to § 580B discusses the negligence standard and notes that the question of negligence has been expressed both in terms of the defendants' state of mind ("by asking whether he had reasonable grounds for believing that the communication was true") and in terms of conduct ("whether the defendant acted reasonably in checking on the truth or falsity or defamatory character of the communication before publishing it"). The Restatement text, however, is clear that the negligence relates to whether the defendant "acts negligently" in failing to ascertain the falsity of the statement. It is clear from the reporter's notes and appendix to § 580B that the vast majority of the states have opted for this negligence standard.
Although there is no New Jersey appellate authority mandating the negligence standard for a nonpublic figure, by implication the New Jersey Supreme Court in Lawrence v. Bauer has indicated that the negligence standard should be applied. The court there analyzed the plaintiffs' status by first finding that they were not "public officials" and then that they were not "public figures for all purposes." The court found each of them, however, to have been "a public figure with regard only to the firehouse appropriation controversy and the petition drive they spearheaded to force a public referendum on the matter." 89 N.J. at 463. The mere fact of the court's analysis of the rules governing media libel of a public official or public figure and analysis of each defendant's status indicates that our Supreme Court chose not to foreclose consideration of a different standard to be applied to a private figure. Were New Jersey to be included within the few jurisdictions that have established the higher New York Times Inc. malice requirements for a private plaintiff (usually limited to a matter of public or general concern), there would have been no reason for the Supreme Court to have undertaken the analysis it did. *314 Justice Clifford merely could have stated that New Jersey was adopting the higher standard of proof and, therefore, the status of the plaintiff was irrelevant.
An Annotation, "State constitutional protection of allegedly defamatory statements regarding private individuals," 33 A.L.R. 4th 212, 221-231 (1984), analyzes the directions taken after Gertz struck down the pervasive libel per se standard. One state, New York, has opted for an intermediate standard, at least where the matter discussed is arguably within the sphere of legitimate public concern. Chapadeau v. Utica Observer-Dispatch, Inc., 38 N.Y.2d 196, 379 N.Y.S.2d 61, 341 N.E.2d 569 (1975); Karaduman v. Newsday, Inc., 51 N.Y.2d 531, 435 N.Y.S.2d 556, 416 N.E.2d 557 (1980). Three states, Alaska, Colorado and Indiana, have imposed the minimum restraint on free speech and adopted the New York Times Co. v. Sullivan public figure test of malice.[1] The remaining 23 jurisdictions that have considered this matter have adopted a negligence standard.[2]See also Appendix to Restatement, Torts 2d, § 580B for a similar finding.
*315 Except for the implications we draw from Lawrence v. Bauer, New Jersey has not established a rule. Of course, where the defendant can claim a qualified privilege, the higher "malice" standard will be applied. Burke v. Deiner, 97 N.J. 465, 475-478 (1984); Rogozinsky v. Airstream by Angell, 152 N.J. Super. 133, 154-157 (Law Div. 1977), aff'd and modified on other grounds 164 N.J. Super. 465 (App.Div. 1979). But here defendants were not reporting newsworthy statements of others, but were engaged in their own "investigative reporting." The most frequent reason advanced in favor of the majority rule is that if the libel per se rule is unconstitutional, the jurisdiction would choose the closest permissible fault standard, i.e., negligence. The balance between the freedom of the press and rights of a private party to be free from libel has been struck in favor of the individual. From the above authorities we have no hesitancy in holding that the negligence standard, codified in Restatement, Torts 2d, § 580B is the standard best *316 applied in New Jersey in a case of a non-privileged media libel of a private individual.

III
With regard to the issue of damages, it is necessary to discuss further the facts leading up to the claim of libel. Defendant Courier-News became interested in a rumor that the Franklin State Bank was under federal investigation. Charles Nutt, the executive editor of the Courier-News, requested the business editor to find out whether the Franklin State Bank was "in trouble." The business editor in turn asked a former reporter, then working for the Gannett News Service in Trenton, to find out if there was a pending investigation into loans made by Franklin State Bank or other problems relating to the bank (the Courier-News is a Gannett paper). From these investigations the executive editor specifically became interested in determining whether the F.B.I. or the Federal Deposit Insurance Corporation was investigating specific loans at Franklin State Bank. In particular, he directed his inquiry into whether the bank had made any major loans to its directors or whether there was a pattern of failed loans or other signs of loan problems at the bank. He suggested that defendant Meddis, a general assignment reporter, be assigned to this investigation, since in the past he had been responsible for most of the research in complicated long-term stories involving a high level of reporting skills.
Other reporters were assigned to help Meddis research the story. One was asked to check Trenton sources and inter alia to determine if lawsuits or judgments were on file with the Superior Court and whether present or former officers were connected with corporations involved with the bank. Meddis testified that the business editor's initial memorandum stated that the bank was having serious financial problems and that directors and their friends had been given big loans by the bank.
*317 An unidentified law enforcement official allegedly told Meddis that the F.B.I. was investigating Franklin State Bank loans and that there was a connection to plaintiff, specifically that the loans involved Country Chevrolet, an automobile dealership in Franklin. The investigation concerned whether the dealership falsified credit statements on more than $2,000,000 in consumer loans. The informant also told Meddis that plaintiff originally sold the land on which the dealership was located.
Meddis began his own investigation by searching the records on file in the Somerset County Clerk's office involving the bank's officers. His mortgage search revealed a number of loans involving plaintiff, some of which were in the names of separate companies in which other directors were affiliated, including Sisler Brothers Construction Company, Sisler Enterprises, Somerset Development Corporation and Apt-to-Acres.
After conferring with his superiors, Meddis requested additional reporters to be assigned to work with him. At least three additional Courier-News reporters were assigned to assist Meddis, and a few days later, after confirmation that the New Jersey Department of Banking and the F.B.I. were investigating Franklin State Bank loans, Nutt determined that his staff was ready to print a story. The story entitled "State, FBI Probe Loans by Franklin State Bank," was written by defendant Meddis and another reporter assigned to the case, Janet Thompson. The only reference to plaintiff in this article was as background, wherein he was credited with leading the bank through its rapid growth in the late 1960's and early 1970's. Plaintiff has not claimed that this article was defamatory.
The newspaper continued its investigation, the staff checking on real estate purchases, sales, mortgages and leases, as well as loans from the bank to plaintiff and others connected with the bank. Meddis learned that plaintiff and a number of other bank directors were associated with two companies, Somerset Affiliates and Somerset Development Corporation. Bank directors involved in both corporations confirmed that these companies *318 had sold the property on which the Chevrolet agency was located to one Michael Cantor for approximately $550,000 after a project to build a shopping center on the property had failed. A second tract originally slated for development adjacent to the proposed shopping center was leased to Cantor who in turn leased both parcels to the Chevrolet agency.
Meddis spoke to plaintiff and asked him if the transactions between the companies and Cantor created a conflict of interest. Plaintiff said they did not, in that the transactions were strictly real estate matters and that plaintiff had nothing to do with the loans then under investigation. Meddis attempted to obtain a statement from another bank director who declined to comment; neither Michael Cantor nor the current president of Franklin State Bank was available. A former vice president of installment loans would make no comment, and the manager of the Chevrolet agency only confirmed that the agency did business with the bank, but also would not comment on the investigation.
On Tuesday, August 18, 1981 Meddis wrote an article connecting the directors' companies and the Chevrolet agency. Nutt reviewed the article before publication and wrote a headline: "Bank Officials have Ties with Firm in Loan Probe." On the day the article was published, Wednesday, August 19th, Meddis spoke to Kenneth Bott, the president of Franklin State Bank and read the article to him. Meddis contended that Bott agreed that the article was accurate, only disagreeing with the first paragraph which suggested that there were direct dealings between bank officials and the Chevrolet agency when, in fact, there was only an arms-length business relationship.[3]
*319 At the trial plaintiff challenged the use of the phrase "private financial dealings" and stated that there had been no dealings either public or private with the Chevrolet dealership. He also challenged the use of the word "ties" in the headline stating that the directors' dealings had been with Cantor, and they had had nothing to do with the Chevrolet agency.
Nutt has admitted that he never talked with Cantor, no one affiliated with the two corporations had told him they had met or dealt with Cantor directly and that he knew of no direct dealings between plaintiff and the Chevrolet agency. He had no information involving the directors with any of the questionable loans under investigation.
In the course of his earlier investigation Meddis determined that there was a mortgage in favor of the bank encumbering the Sisler Building as security for a $2,000,000 loan. Meddis asked the Somerset County Clerk if the mortgage indicated that the building had been mortgaged for $2,000,000. The clerk (who is not a lawyer and whose duties do not include explaining the legal significance of documents) agreed with Meddis' interpretation. The final paragraph of the mortgage read as follows:
The within Mortgage is given as security for Mortgagors' [plaintiff and his son, Gary Sisler, t/a Sisler Enterprises] unconditional guarantee of the payment and performance of all liabilities and obligations of Apt-To-Acres, Inc., a New Jersey corporation, to Franklin State Bank, as such liabilities and obligations are set forth in a certain Finance and Security Agreement made as of May 28, 1980 between Apt-To-Acres, Inc. and Franklin State Bank, as well as all liabilities and obligations of said Apt-To-Acres, Inc. under the Term Note, Line *320 Note and Revolving Credit Note issued pursuant to such Finance and Security Agreement.
Meddis asked the County Clerk if the security agreement referred to in the mortgage was a public record and was informed that it was not. The Clerk further explained to Meddis that this mortgage did not encumber Apt-to-Acres, also mentioned in this last paragraph.
Meddis had learned that plaintiff resided in Manalapan Township in Monmouth County and asked one of his assistants who was leaving for the shore to stop at the Monmouth County Clerk's office and do a general search of documents similar to the one he was performing in Somerset County. Specifically, she was asked to check for mortgages and deeds involving plaintiff, Sisler Enterprises and Apt-to-Acres. She copied a number of documents involving plaintiff but did not search the name Apt-to-Acres, Inc. because she did not have enough time before the office closed. She called Meddis, informed him of this fact and was told that he did not need the information for his current story. She neither returned nor was asked to return to check the balance of the record in the Monmouth County Clerk's office.
Meddis testified further that he met an attorney he knew on the street in Somerville and asked him to read the above-quoted last paragraph on the first page of the Somerset County mortgage. After this discussion of less than five minutes Meddis felt that his understanding of the mortgage was correct.[4]
*321 Meddis questioned plaintiff concerning "a recorded document" showing that plaintiff obtained a $2,000,000 loan from Franklin State Bank secured by the Sisler Building. Plaintiff denied having any knowledge of such a loan. Plaintiff told Meddis that there had been a mortgage on the Sisler Building since 1969, originally for $325,000 but paid down to approximately $200,000. Meddis told plaintiff that he was aware of a number of other mortgages on the Sisler Building, but plaintiff denied they existed. Meddis told plaintiff that he was looking at a mortgage dated August 16, 1976 securing a $375,000 loan, but plaintiff also denied that there was such a mortgage. When Meddis tried to ask plaintiff about other mortgages, plaintiff told him that he did not want to discuss his personal finances, and the conversation ended. Meddis then attempted to contact the two attorneys whose names were listed on the mortgage to try to get additional information, but neither of the attorneys was available.
Meddis finally spoke to the bank president, Kenneth Bott, who described the original 1969 mortgage and said that the current outstanding balance was approximately $200,000. When Meddis told him that he found a $2,000,000 loan against the property, Bott told him specifically that the loan had been taken as "additional collateral for other dealings." When Meddis asked him to explain what he meant by that, Bott told him that he could not discuss "another man's borrowings." Meddis further questioned Bott concerning the assessed value of the Sisler Building and how the bank could accept the building as collateral for such a large loan. Bott explained that the bank relies on appraised rather than assessed values, and that a year or two earlier the appraised value of the building was $700,000. When pressed concerning other mortgages against the building, Bott said there may have been a mortgage without any money being extended. He also said a mortgage may have been *322 collateral for other loans. When specifically asked whether these loans involved Apt-to-Acres, Bott said he could not discuss that, as it was privileged information which could be obtained only from plaintiff. Bott denied any wrongdoing and told Meddis that the bank's board had always been extremely careful in any dealings with officials and directors and that these transactions were carefully scrutinized by the bank examiners.
On August 20, 1981 (the day after the article alleging "private financial dealings" with the Chevrolet agency), the Courier-News published an article written by Meddis with a headline "Bank's ex-chief used low collateral in loan." The opening paragraphs read as follows:
Shortly after the chairman of Franklin State Bank resigned last year, he obtained a $2 million mortgage loan from the institution with collateral valued at a fraction of that amount.
Local entrepreneur Mayo S. Sisler got the loan even though the Somerset office building he used as collateral was already heavily mortgaged and located in an area of relatively high economic risk. The assessed value of the property is less than $400,000.
Sisler disclaimed any knowledge of the mortgage and declined to fully discuss his personal lending activities with Franklin State, which grew to be New Jersey's 27th largest bank under his leadership.
He said he only recalled obtaining a 1969 mortgage of approximately $325,000 through Franklin State on his office property. That loan is still being paid, he said.
The article continued, quoting from information provided by Bott, including his assertion that "there was `absolutely' no wrongdoing involved in the loan." The article then stated that the newspaper had found the Sisler mortgage "after learning that bank officers have had private business dealings with the landlord of a car sales operation being investigated by state and federal authorities in connection with more that $2 million questionable installment loans." The article then proceeded to describe the alleged mortgage transaction, revealing defendants' complete misunderstanding of the use of "side collateral" or "additional collateral":
Additional records indicate that in June 1980, Sisler and his son, Gary  partners in Sisler Enterprises  mortgaged a less than one-acre property at 900 *323 Hamilton St. through Franklin State for $2 million to satisfy debts on the Sisler horse farm in Manalapan Township.
........
His farm, Apt-To-Acres, Inc., was in debt to Franklin State for unspecified amounts borrowed through revolving credit and other notes, according to the mortgage.
It indicates that Sisler sought to pay off the credit, at least in part, by mortgaging the 900 Hamilton St. property, which has a long history as collateral with Franklin State. The mortgaging began after Sisler and his brother, Donald, purchased the land for $27,500 from a Somerset widow in May 1969.
The article then attempted to describe the financing history of the Sisler Building, misinterpreting mortgages given upon the refinancing of the property as new loans, noting that "the same property was the sole collateral that was posted for the loans." The remainder of the article traced the tax appeals that plaintiff had litigated and quoted the bank president's statements declining comment concerning plaintiff's affairs except to state "there was no money extended; it was taken as collateral on other loans."
As is apparent to an attorney, the mortgage in question was side collateral securing the guarantees of plaintiff and his son of the obligations of Apt-to-Acres, Inc. to Franklin State Bank under a security agreement dated May 28, 1980. A search of the Monmouth County Clerk's records and those of the Secretary of State would have revealed mortgages on the Apt-to-Acres real estate, financing statements encumbering the farm equipment and horses as well as the guarantees of the principals and the use of the Somerset County mortgage as partial security for the guarantees. The financial transaction actually involved three loans with a total potential bank advancement of $2,250,000, comprised of a 1.5 million dollar term loan, a $500,000 revolving credit line under which the bank would advance up to 50% of the appraised values of the horses owned by Apt-to-Acres, with an additional $250,000 line of credit secured by the yearlings (year-old horses), which was not to exceed 50% of the appraised value of such yearlings.
*324 The collective agreements were cross-collateralized by all of the security pledged. Appraisals of the security showed that the farm was worth between 2.9 and 3.19 million dollars. The livestock was valued at $2,247,000 and a current appraisal of the Sisler Building was $703,000. The net collateral after outstanding mortgages for the $2,250,000 loan package was approximately $6,000,000.
Bott testified that he tried to explain to Meddis the concept of taking side collateral or additional collateral, but Meddis did not seem to understand. Bott specifically told Meddis not to publish the article because it was grossly inaccurate.
As to the Sisler Building itself, a vice-president of Franklin State Bank explained that plaintiff was originally given a construction loan of $280,000 which was cancelled when the permanent mortgage of $375,000 was placed on the building. In 1976 the building was pledged as additional collateral for a loan to Apt-to-Acres, but this mortgage was not cancelled of record, even though there had been a refinancing of the Apt-to-Acres' loan in 1977. In 1980 there was a similar refinancing, the proceeds of which paid off the 1977 mortgage. Although the earlier loans had been paid on refinancing, the mortgages had not been cancelled of record. Since they all were in favor of the same lender, the bank did not object. Plaintiff admitted that the face amount of the mortgages on record encumbering the building totalled 4.2 million dollars as of the date of the published article. (The building was sold to the bank in December 1982 for $575,000).
Plaintiff testified that he had told Meddis that he did not have a $2,000,000 mortgage against the Sisler Building since the $2,000,000 had been lent to Apt-to-Acres. When apprised by Meddis of his claims concerning the pledging of the Sisler Building, plaintiff became upset and told Meddis that the facts Meddis had were wrong and that if he published them plaintiff would sue him.
*325 After publication of the articles on August 19 and 20, 1981 the Courier-News received numerous complaints from bank officials, whereupon the publisher and Nutt met with Bott and other bank representatives. At this meeting Bott explained the complete financing arrangement. The paper printed two retractions, one on August 28, 1981, and a second, at the insistence of plaintiff's attorney, on September 18, 1981. They explained the inaccuracies in the articles and acknowledged the paper's "oversight."
At the time the defamatory articles were published plaintiff was the sole stockholder of Apt-to-Acres, Inc. which owned a stud farm for standardbred horses. Arrangements would be made for standardbred stallions to "stand" at Apt-to-Acres. The farm then would advertise in trade journals that the stallion would be boarded there and owners of mares wishing to mate them with the stallions would make arrangements to come to the farm and mate the mares for breeding purposes. The owners of the mares paid stud fees and boarding rates. In addition, the farm owners would be entitled to breeding rights, permitting the stallions to mate with the farm's own mares, without charge.
A leading stallion at Apt-to-Acres was B.G.'s Bunny, managed by Louis Guida. Guida testified that he was a syndicate manager, meaning that he managed the careers of horses that had been syndicated, i.e., owned by a number of individuals.
Prior to the publication of the defamatory articles plaintiff had been negotiating with Guida to have three other horses Guida managed, Seahawk Hanover, Computer and Niatross, brought to "stand" at Apt-to-Acres. Plaintiff notes that Niatross was generally regarded as the "greatest stallion" of its kind. Guida testified that Apt-to-Acres had a good reputation in 1981 as a commercial rather than a family business with good facilities and good employees. While B.G.'s Bunny was standing at Apt-to-Acres in 1979, he spoke to plaintiff daily *326 during the breeding season to approve the mares to be mated with his stallion.
Guida further testified that Computer and Seahawk Hanover were two of the best horses going to stud in 1981 from a few of their racing records. In fact, in July 1981, Guida had sold plaintiff a share of Seahawk Hanover as a condition to having him stand at Apt-to-Acres. He had placed Niatross at a stud farm in Kentucky, but had had problems with that farm and had decided to move him. Almost every farm in the racing business, including Apt-to-Acres, had solicited Niatross. Guida told plaintiff that not only was his farm under consideration, but that he was leaning in favor of plaintiff.
During these negotiations the Courier-News articles of August 19 and 20 were mailed anonymously to Guida who was "infuriated." As a syndicate manager he was responsible for the careers of these valuable horses, and, since integrity was an important factor, he wanted to avoid becoming involved in the controversy surrounding plaintiff. With so many other farms bidding for Niatross, Guida saw no reason to send the horse to a farm to which a stigma was attached. He, therefore, sent plaintiff a letter that Seahawk Hanover and Computer would not be standing at Apt-to-Acres for the 1982 breeding season nor would Niatross be there for the 1983 breeding season. He felt that this action had to be taken recognizing his "obligation to all of the Shareholders plus myself to do what I believe is in the best interest of all concerned." The letter continued:
I have read and reviewed all the articles that appeared in the Plainfield paper and even though a newspaper is not the judge and jury they impact the public and create an impression. My dealings with you have always been excellent and I'm certain that the accusations made by the newspaper are not accurate, but that's only my opinion and I can not be put in the position of defending you when questions are raised in the horse industry. The articles do raise doubt as to the financial stability of you and the farm as well as the most important item  "integrity"! Please understand and understand it clearly that what I am indicating in this letter should not be taken personally as this is totally a business decision. However, under the circumstances there is no way I could justify to the Syndicate members who have invested multi-millions of dollars in the Stallions that they should stand at Apt-to-Acres. There are many other *327 farms of equal quality vying for them and if you were in my position you would be forced to make the same decision I am making.
These studs are all of national prominence and will attract nationwide attention and in some cases even worldwide attention. Sooner or later these newspaper articles would surface and my integrity and business judgment would be questioned and even though I feel comfortable defending that position I can not allow myself to be put in that circumstance especially when there are other viable alternatives available.
Guida then stated that B.G.'s Bunny could remain at Apt-to-Acres for the time being, but noted that "there is the very real possibility that pressure may be put on me to remove him from your farm" and that Guida "can offer [Sisler] no guarantees." The letter concluded noting the vast economic impact of losing the three stallions and stating that Guida's personal feelings towards Sisler and his operations were "as high as they have always been."
As some indication of plaintiff's losses, the contract losses with the other stud farms where the three horses were placed reveal that 12 free breedings were given with Niatross and 15 free breedings each with Seahawk Hanover and Computer. Stud fees for B.G.'s Bunny had ranged from $4,000 before the offspring proved successful to $15,000 after some track successes. In addition Guida testified that he purchased 7 yearlings that were offsprings of Niatross for which he paid a total of $875,000 in cash.
To reinforce the notion that the relationship between the stud farm owner and the syndicate manager is based on trust, a veterinarian serving Apt-to-Acres testified that standardbred horses are impregnated by artificial insemination which greatly increases the possibility of misrepresenting a horse's parentage.
Defendants contend that since Apt-to-Acres suffered the direct economic loss, plaintiff lacked standing to assert the same. Since it was plaintiff that was libeled, not the farm, Judge Gaynor had dismissed the farm's complaint. While it may have been the better practice to have retained the farm corporation as a party plaintiff, the issues were so clearly *328 brought before the jury that there is no reason to disturb Judge Gaynor's decision. The defamation had involved the allegation of undercollateralization for a loan which, although not recognized by defendants, was made to Apt-to-Acres and only guaranteed by plaintiff. Where plaintiff's integrity in the standardbred breeders' marketplace was drawn into question, by innuendo the corporation's integrity was also challenged, since plaintiff was its sole representative. But, since the jury was permitted to appraise the damages to plaintiff as including the corporation's losses, the net result is the same.
Trenton Mutual Life & Fire Ins. Co. v. Perrine, 23 N.J.L. 402, 407-412 (Sup.Ct. 1852), was raised by defendant to establish the rights of the corporation as opposed to those of plaintiff. The case is distinguishable because the defamatory articles directly related to the way the corporate business was conducted, and the actual injury was a corporate injury. The articles alleged a corporate gain based upon the directors' unethical business practices. Here, only the plaintiff was attacked and the loss to the corporation was consequential to the personal attack which was primarily directed at plaintiff's relationship with the Franklin State Bank, his former employer. Defendants also cite Green v. Victor Talking Mach. Co., 24 F.2d 378, 380-381 (2d Cir.), cert. den. 278 U.S. 602, 49 S.Ct. 9, 73 L.Ed. 530 (1928), which held that a corporation's shareholders, even if there is but one shareholder, cannot assert a corporation's rights and individually sue the tortfeasor in an action at law. This is quite different from the situation we have here where plaintiff's personal rights were infringed upon and the only corporate effect was the loss of profits which would have inured to plaintiff's benefit as the sole shareholder. As we have noted, however, insofar as the losses were corporate losses, the corporate plaintiff should have remained in the case but since the losses have been demonstrated and assessed by the jury on behalf of the sole stockholder, we see no reason to reverse or remand for a new trial.
*329 Plaintiff had cross-appealed on the issue of increased compensatory damage and punitive damages. Plaintiff, however, requested that this court only consider such issues if such consideration would not prejudice the initial jury award. If damages were to be reopened as an issue, we can see no basis upon which plaintiff could retain his present award for general compensatory damages and then have a new jury assess additional compensatory damages if they found the same justified. As to punitive damages, there was no testimony in this case in which a reasonable jury could have found the requisite malice or intent to harm. We will consider the cross-appeal withdrawn as to additional compensatory damages, and affirm Judge Gaynor's decision to strike the punitive damage claim.
The judgment appealed from is affirmed in all respects.
NOTES
[1] Gay v. Williams, 486 F. Supp. 12 (D.Alaska 1979) (based upon pre-Gertz authorities); Diversified Management, Inc. v. Denver Post, Inc., 653 P.2d 1103, 33 A.L.R. 193 (Colo. 1982); AAFCO Heating & Air Conditioning Co. v. Northwest Publications, Inc., 162 Ind. App. 671, 321 N.E.2d 580, cert. den. 424 U.S. 913, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1974).
[2] Antwerp Diamond Exch., Inc. v. Better Business Bureau, 130 Ariz. 523, 637 P.2d 733 (1981); Little Rock, Newspapers, Inc. v. Dodrill, 281 Ark. 25, 660 S.W.2d 933 (1983); Phillips v. Evening Star Newspaper Co., 424 A.2d 78 (D.C.App. 1980), cert. den. 451 U.S. 989, 101 S.Ct. 2327, 68 L.Ed.2d 848 (1981); Gadsden Cty. Times, Inc. v. Horne, 382 So.2d 347 (Fla. Dist. Ct. App. 1980); Rosanova v. Playboy Enterprises, Inc., 411 F. Supp. 440 (S.D.Ga.), aff'd 580 F.2d 859 (5th Cir.1976) (applying Georgia law); Cahill v. Hawaiian Paradise Park Corp., 56 Hawaii 522, 543 P.2d 1356 (1975); Gertz v. Robert Welch, Inc., 680 F.2d 527 (7th Cir.1982) (applying Illinois law), cert. den. 459 U.S. 1226, 103 S.Ct. 1233, 75 L.Ed.2d 467 (1983); Steere v. Cupp, 226 Kan. 566, 602 P.2d 1267 (1979); McCall v. Courier-Journal & Louisville Times Co., 623 S.W.2d 882 (Ky. 1981), cert. den. 456 U.S. 975, 102 S.Ct. 2239, 72 L.Ed.2d 849 (1982); E.W. Scripps Co. v. Cholmondelay, 569 S.W.2d 700 (Ky. Ct. App. 1978); Jenoff v. Hearst Corp., 644 F.2d 1004 (4th Cir.1981) (applying Maryland law); Schrottman v. Barnicle, 386 Mass. 627, 437 N.E.2d 205 (1982); Brewer v. Memphis Pub. Co., 626 F.2d 1238 (5th Cir.1980) (applying Mississippi law), reh. den. 638 F.2d 247, cert. den. 452 U.S. 962, 101 S.Ct. 3112, 69 L.Ed.2d 973 (1981); Marchiondo v. Brown, 98 N.M. 394, 649 P.2d 462, cert. quashed 98 N.M. 336, 648 P.2d 794 (1982); Thomas H. Maloney & Sons, Inc. v. E.W. Scripps Co., 43 Ohio App.2d 105, 72 Ohio Op.2d 313, 334 N.E.2d 494, cert. den. 423 U.S. 883, 96 S.Ct. 151, 46 L.Ed.2d 111 (1975); Weaver v. Pryor Jeffersonian, 569 P.2d 967 (Okla. 1977); Mathis v. Philadelphia Newspapers, Inc., 455 F. Supp. 406 (E.D.Pa. 1978) (applying Pennsylvania law); Memphis Pub. Co. v. Nichols, 569 S.W.2d 412 (Tenn. 1978); Foster v. Laredo Newspapers, Inc., 541 S.W.2d 809 (Tex. 1976), cert. den. 429 U.S. 1123, 97 S.Ct. 1160, 51 L.Ed.2d 573 (1977); Seegmiller v. KSL, Inc., 626 P.2d 968 (Utah 1981); Mills v. Kingsport Times-News, 475 F. Supp. 1005 (W.D.Va. 1979) (applying Virginia law where correct information is available in public records but the media defendant receives its information from other sources); but see pre-Gertz case of Sanders v. Harris, 213 Va. 369, 192 S.E.2d 754 (1972) (applying a malice standard); Ali v. Daily News Pub. Co., 540 F. Supp. 142 (D.C.VI. 1982) (apparently applying Virgin Islands law); Mark v. Seattle Times, 96 Wash.2d 473, 635 P.2d 1081, cert. den. 457 U.S. 1124, 102 S.Ct. 2942, 73 L.Ed.2d 1339 (1982); Havalunch, Inc. v. Mazza, 294 S.E.2d 70 (W. Va. 1981); Denny v. Mertz, 106 Wis.2d 636, 318 N.W.2d 141, cert. den. 459 U.S. 883, 103 S.Ct. 179, 74 L.Ed.2d 147 (1982).
[3] The first three paragraphs of this article state:

Current and former officers of Franklin State Bank have private financial dealings with a car sales operation being investigated in connection with more than $2 million in questionable loans at the Somerset-based bank.
Deeds and mortgages reviewed by The Courier-News show that in recent years some of the bank's leading figures have privately sold and leased property to the landlord of Country Chevrolet Inc., a Franklin Township car dealership.
State and federal authorities are probing whether installment loans were obtained from the bank by Country Chevrolet personnel through falsified credit statements. The F.B.I. is involved in the probe, according to sources. However, the bureau has declined to confirm or deny whether there is an investigation.
[4] This testimony was permitted only to show Meddis' state of mind. As a rebuttal witness, plaintiff produced an attorney (now a partner of plaintiff's counsel) who stated that on a morning in August 1981 Meddis had stopped him on the street and asked if he knew plaintiff. The attorney said that he did not and suggested that Meddis talk to the attorney who represented Franklin State Bank who had experience in that area, unlike the witness who had never handled a real estate transaction. The bank's attorney testified that Meddis never showed him the mortgage in question and he never discussed plaintiff's loan or mortgage arrangements with Meddis. Meddis, relying on privilege, did not confirm that the first attorney was the one who allegedly agreed with his interpretation of the mortgage.