208 N.J. Super. 163 (1986)
505 A.2d 166
GEORGE BARASCH, PLAINTIFF-APPELLANT,
v.
SOHO WEEKLY NEWS, INC., A CORPORATION, JOHN LEESE, ROBERT KARL MANOFF, JOHN FRIEDMAN AND ERIC NADLER, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Submitted December 17, 1985.
Decided January 31, 1986.
*167 Before Judges DREIER, BILDER and GRUCCIO.
Krieger, Ferrara, Flynn & Catalina, attorneys for appellant (Frank E. Catalina and Harold Krieger, on the brief).
Winne, Banta, Rizzi, Hetherington & Basralian, attorneys for respondents (Andrew P. Napolitano, of counsel; Corinne M. Mullen, on the brief).
The opinion of the Court was delivered by DREIER, J.A.D.
Plaintiff has appealed from a summary judgment in favor of defendants predicated on a determination that plaintiff was a public figure as to whom the actual-malice libel standard of New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), was applicable. The trial judge also held that plaintiff had offered no evidence upon which defendants' selection of material concerning plaintiff and its manner of presentation could have been found maliciously defamatory.
Plaintiff George Barasch alleged in his complaint that he was libeled by an article published in the Soho Weekly News on July 15, 1981. After attempts to secure a retraction, plaintiff filed his complaint in October 1981 against the publisher, Soho Weekly News, Inc.; the managing editor and two reporters. In August 1984 plaintiff was granted a partial summary judgment ruling the article to be defamatory per se as to plaintiff in that it was "not reasonably susceptible of a nondefamatory interpretation." The judge hearing the earlier motion summarized the innuendo claimed by plaintiff from the quoted article as "imputing commission of a crime, ... imputing dishonesty, fraud or *168 cheating ... [and] ... reflecting adversely on plaintiff's office, business or employment."
Plaintiff is self-employed, but between 1936 and 1963 he had been associated with labor unions, specifically the Allied Trades Council, Local 815. He had served in the position of Secretary/Treasurer of Local 815, and as President of the Allied Trades Council. He also functioned as the Administrator of the Allied Welfare Fund from 1954 to 1978 and of the Union Mutual Fund from 1955 through the institution of this litigation. In addition, plaintiff was President of The Cromwell Research Foundation from 1956 to 1966 and The Chemical Research Foundation from 1957 to 1966. Both are charitable foundations. He was also President of the New York Cardiac Center, an institution engaged in medical research, and was active with the Center from 1950 through the time of trial.
On July 15, 1981, defendant Soho Weekly News printed an article concerning the activities of Accuracy in Media (AIM), a nonprofit organization devoted to monitoring the media. The article reviewed the history of AIM and stressed the financial support of the organization by a major oil company and the Teamsters' Union. The article described AIM's fourth annual conference, a two-day session at which prominent political and media personalities appeared. The article noted that the organization issues a twice-monthly newsletter reaching over 30,000 dues-paying members and that a radio commentary program by the organization's founder and chairman, Reed Irvine, a former economist for the Federal Reserve Board, is broadcast by 30 radio stations. Irvine's newspaper column is syndicated in 100 newspapers. The publication further stated that plaintiff, together with Ernest Lefever, who had been a candidate for Assistant Secretary of State for Human Rights and Humanitarian Affairs, and Arnaud de Borchgrave, a former foreign correspondent for Newsweek and coauthor of The Spike, received awards at the conference.
*169 The thrust of the article, however, concerned the financial support for AIM, and noted that the Allied Educational Foundation, "an elusive entity closely tied to Local 815 of the International Brotherhood of Teamsters and to the Allied Trades Council," was a substantial donor, having given $50,000 to AIM to fund a speakers bureau. Plaintiff was then identified as the "administrator of the foundation, former President of the Allied Trades Council and former Secretary/Treasurer of Teamsters' Local 815." What followed was the alleged defamatory material, purportedly a summary of a 1966 report of the Senate Subcommittee on Investigations. The alleged defamatory statement reads:
Perhaps the most intriguing AIM donor is the Allied Educational Foundation, an elusive entity closely tied to Local 815 of the International Brotherhood of Teamsters and to the Allied Trades Council. All three organizations are headquartered in the same office in a two-story brick building at 467 Sylvan Avenue in Englewood Cliffs, New Jersey.
According to Irvine, in December 1980 the foundation `made a gift of $50,000 to Accuracy in Media to fund a speakers bureau' that has paid to send Irvine and other AIM officials across the country. The foundation also cosponsored the recent annual conference.
George Barasch, administrator of the foundation, former president of the Allied Trades Council and former secretary-treasurer of teamsters Local 815, received an award at the conference, right before Lefever and deBorchgrave.
In a 1966 report, Barasch was accused by the Senate Subcommittee on Investigations, then under the chairmanship of Arkansas Senator John McClellan of diverting almost $5 million of union and welfare pension funds to private corporations in the continental United States, Puerto Rico, and Liberia controlled by him and his brother-in-law. Barasch's activities were also investigated by the FBI and the U.S. Attorney for the Southern District of New York, but he was never indicted.
The Allied Educational Foundation, according to Lewis G. Bernstein, one of its four current trustees, was founded by Barasch. Internal Revenue Service files show that it is a tax-exempt organization, started shortly after Barasch agreed to return to the unions the funds from the private corporations he had set up. According to Bernstein, the foundation, supported by employer contributions, is part of a benefit fund of the Allied Trades Council and Teamsters Local 815, and gives scholarships to the children of union members and sponsors conferences on a wide range of issues. The contribution to AIM was arranged by AIM president Murray Baron, former vice-president of the New Jersey CIO and a founder of the Liberal party in New York State and an old friend of Barasch's.
*170 There are two issues before us. First, we must determine whether the trial court applied the correct standards in holding that plaintiff was a public figure. Second, we must determine whether plaintiff properly had placed before the trial judge facts upon which a jury could find that the article was defamatory to the standard required by plaintiff's status.

I  Public Figure Status
New York Times Co. v. Sullivan, supra, left open the issue of who would be considered a public figure for the purposes of the rules there established. The history of the doctrine was reviewed by Justice Schreiber in his dissenting opinion in Lawrence v. Bauer Pub. & Print. Ltd., 89 N.J. 451, 470-474 (1982), and need not be repeated here. It is clear, however, that as of Gertz v. Welch, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the New York Times rule protected the press as to statements concerning both personalities generally known to the public and also limited public figures who had thrust themselves "into the vortex of [a] public issue," or who had "engage[d] the public's attention in an attempt to influence its outcome." 418 U.S. at 352, 94 S.Ct. at 3013, 41 L.Ed.2d at 812. Although the plaintiff in Gertz had been active in community and professional affairs, had published books and articles on legal subjects and "was consequently well known in some circles, he had achieved no general fame or notoriety in the community." 418 U.S. at 351-352, 94 S.Ct. at 3012-B, 41 L.Ed.2d at 812. The Court distinguished between general and limited public figures as follows:
We would not lightly assume that a citizen's participation in community and professional affairs rendered him a public figure for all purposes. Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life. It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation. [418 U.S. at 352, 94 S.Ct. at 3013, 41 L.Ed.2d at 812].
*171 The trial judge here determined that plaintiff was both a general and limited public figure. At least as to the finding of a general public figure, we are constrained to disagree. Applying the standard just quoted, the trial judge could only have considered plaintiff to have been a limited public figure, and we shall continue our analysis upon that assumption.

A. Plaintiff's 1966 Activities
As this court has noted in Sisler v. Courier-News Co., 199 N.J. Super. 307, 311-12 (App.Div. 1985), certif. granted 101 N.J. 289 (1985)), although a plaintiff at a prior time may have qualified as a limited public figure concerning the activities of a local public office or otherwise, with the passage of time such notoriety fades since the issues generated through the actor's participation in the earlier activity no longer remain before the public. This is not to say that a plaintiff loses status as a public figure for the particular purposes that supported that status, but only that the issues no longer satisfy the requirement of a "public controversy." The question of the loss of public-figure status merely by the passage of time has expressly been left open by the United States Supreme Court. See Wolston v. Readers Digest Assn. Inc., 443 U.S. 157, 165 at n. 7, 99 S.Ct. 2701, 2706 at n. 7, 61 L.Ed.2d 450, 459 at n. 7 (1979). See also Marcone v. Penthouse International Magazine for Men, 754 F.2d 1072, 1087 at n. 10 (3d Cir.1985), cert. den. ___ U.S. ___, 106 S.Ct. 182, 88 L.Ed.2d 151 (1985) (where the court noted "that theoretically the passage of time might permit a public figure to regain private status, but such was not the case" before it); Street v. National Broadcasting Co., 645 F.2d 1227, 1234-35 (6th Cir.1981) app. dis. 454 U.S. 1095, 102 S.Ct. 667, 70 L.Ed.2d 636 (1981), (where the Court held "that once a person becomes a public figure in connection with a particular controversy, that person remains a public figure thereafter for purposes of later commentary or treatment of that controversy") (emphasis the court's); and Brewer v. Memphis Publishing Co. Inc., 626 F.2d 1238 (5th Cir.1980), cert. den. 452 U.S. *172 962, 101 S.Ct. 3112, 69 L.Ed.2d 973 (1981) (where the court observed that the passage of time might restrict the issues subject to the malice standard, but not the public-figure status itself).
If plaintiff had been a limited public figure at the time of the Senate hearings described in the publication involved in this case, he may still have been subject to the malice standard concerning comments arising from a later revival of the controversies that surrounded the 1966 issues. The trial court, however, failed to inquire into or connect those issues with sponsorship by plaintiff's organization of the AIM conference, his acceptance of the award at the AIM annual banquet or his organization's substantial funding of AIM's activities. Only if such connection could be made should comments concerning plaintiff's 1966 activities fall under the malice limitations imposed by plaintiff's earlier notoriety.
Plaintiff might also argue that the earlier notoriety was a result of a Senate investigation in which his participation was involuntary. The Supreme Court in Wolston v. Readers Digest Assn. Inc., supra, determined that involuntary participation in a grand jury investigation where the plaintiff refused to respond to a grand jury subpoena did not constitute the plaintiff there as "a limited-purpose public figure." He had not thereby
`voluntarily thrust' or `injected' himself into the forefront of the public controversy surrounding the investigation of Soviet espionage in the United States ... It would be more accurate to say that petitioner was dragged unwillingly into the controversy. The Government pursued him in its investigation. Petitioner did fail to respond to a grand jury subpoena, and this failure, as well as his subsequent citation for contempt, did attract media attention. But the mere fact that petitioner voluntarily chose not to appear before the grand jury, knowing that his action might be attended by publicity, is not decisive on the question of public-figure status.... [P]etitioner never discussed this matter with the press and limited his involvement to that necessary to defend himself against the contempt charge. It is clear that petitioner played only a minor role in whatever public controversy there may have been concerning the investigation of Soviet espionage. We decline to hold that his mere citation for contempt rendered him a public figure for purposes of comment on the investigation of Soviet espionage. [443 U.S. at 166-67, 99 S.Ct. at 2706-07, 61 L.Ed.2d at 459-460.]
*173 As the Supreme Court in Wolston further noted, the concept of a limited public figure is not to be equated with the concept of newsworthiness.
Petitioner's failure to appear before the grand jury and citation for contempt no doubt were `newsworthy,' but the simple fact that these events attracted media attention also was not conclusive of the public-figure issue. A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention.... A libel defendant must show more than mere newsworthiness to justify application of the demanding burden of New York Times. [443 U.S. at 167-68, 99 S.Ct. at 2707-08, 61 L.Ed.2d at 460.]
Although we have reviewed the 1966 report of the Senate hearings, we deem it inappropriate that we make the determination of whether plaintiff was a mere passive or involuntary participant or whether by the conduct described during the hearings he became a limited public figure for the purpose of comment on activities so investigated. As we noted in Sisler, New Jersey law firmly has established that determination of a plaintiff's public figure or limited public-figure status is "a question properly resolved by the court rather than the jury." 199 N.J. Super. at 312. We have determined that this matter must be remanded to the trial court for further consideration of the limited public-figure issue. The trial judge should have the record expanded by the parties so that he can make factual findings as to plaintiff's active or voluntary participation in the events underlying the investigation as well as the ensuing hearings, all of which defendants now claim rendered him a limited public figure. Marcone v. Penthouse, etc, supra, 754 F.2d at 1085. From these newly adduced facts the trial judge should review and redetermine, if necessary, plaintiff's status at the time of the 1966 hearings and also decide whether those disputes still constituted a "public controversy" in 1981. This is one part of the limited public-figure equation.

B. Plaintiff's 1981 Activities
The second part of this equation involves the nature of the conference and dinner at which plaintiff accepted his award and *174 plaintiff's participation in funding the organization that so honored him. This is, in effect, a separate analysis independently capable of invoking the New York Times malice standard. Here, however, the trial court must engage in a more difficult analysis. There is no question that AIM is an organization that, to paraphrase Gertz, thrusts itself into the vortex of public issues and attempts to engage the public's attention in an attempt to influence the outcome of public issues. Had plaintiff in his own name engaged in these activities, there would be no question that he would be subject to the more stringent standards of New York Times. We are required here, however, to distinguish among three types of activity: (1) public activities such as those of AIM's president and spokesman, whose public-figure status is apparent;[1] (2) supportive activities such as plaintiff's here where there is little, if any, legal precedent, and (3) activities of a small contributor or passive supporter where private status is not lost.[2]
We note the very subject of the conference: "Confrontation PR." The brochure, in evidence before the trial judge, described the conference as one "on new ideas in how to deal with the adversary news media." We have not been told, *175 however, whether there was widespread distribution of the brochure, nor was there evidence as to whether there were extensive public relations efforts by the sponsors concerning the conference and banquet. We, therefore, cannot determine whether plaintiff, by agreeing to accept the award, lent his name and presence to the public controversies which surrounded the organization itself. Since the invitation was issued both in the name of AIM and "Allied Educational Foundation" with which plaintiff was identified in the brochure, it appears that at least plaintiff's organization aligned itself publicly with the purposes of the conference and that plaintiff was not merely a passive recipient of an award. On remand the trial court, applying the principles here stated, should consider on an expanded record whether plaintiff's affiliations with AIM's sponsoring organization were such as to make him, as of 1981 (as opposed to the court's separate determinations concerning his 1966 controversy), a limited public figure as to the public issues raised by the conference and funding of AIM's activities.
To summarize this point, we determine that plaintiff is not a general public figure, but we cannot on this record determine whether plaintiff was a limited public figure thereby entitled to the limited defamation protection of the New York Times malice standard. The trial judge on remand should determine whether plaintiff still possessed in 1981 a sufficient residue of notoriety emanating from the 1966 Senate investigation that his status was resuscitated by his intended appearance at the 1981 conference representing the organization that was the subject of the Senate inquiry. He should couple this analysis with a review of plaintiff's support of the organization or organizations sponsoring the conference, considering whether this latter conduct independently injected plaintiff in a public controversy.
If either analysis justifies the conclusion that plaintiff was a limited public figure and if the comments made were sufficiently relevant to such status, then the limited New York Times protection is all that plaintiff can expect. If the contrary is *176 true, plaintiff may invoke the lesser negligence standard, as noted in Sisler, supra, 199 N.J. Super. at 315-16.

II  Proof of Malice
The trial judge correctly noted that although a defendant's belief in the truth of the matter published might be insufficient to sustain the defense of "truth," such belief is relevant in the determination of "whether the defendant showed actual malice in regard to the truth or falsity of the publication." Lawrence v. Bauer Pub. & Print Ltd., supra, 89 N.J. at 467. See also Restatement, Torts 2d, § 581A, Comment h. at 237. No facts were asserted by plaintiff to show defendants lacked belief as to the truthfulness of the published statements. In fact, the sole circumstances advanced by plaintiff to support a finding of malice is that the official report of the Senate hearings contained exculpatory material that should have been quoted to balance the innuendo raised by the article. There is no question that this material was specifically brought to defendant's attention. Plaintiff's counsel urged that since defendants were aware of the exculpatory material and did not use it, this conduct evinced a "reckless disregard" of the true thrust of the Senate materials. The trial judge stated:
My determination is that there is no evidence before me that would indicate that there is any false statement in that reporting.
The only contention as you have stated that there is anything improper about the manner in which it was reported is that it did not completely report these matters, which you say are exculpatory versus those that were prejudicial to the plaintiff.
Plaintiff's counsel then interrupted and reasserted that the falsity lay "in the failure to include the exculpatory material." The court continued:
I'm saying that that aspect of it and after I have reviewed the record and knowing what the Senate Investigation Committee ... reported ... word for word would have in my opinion done more damage.
I don't think that what they did select or how they have reported and the way it was reported in the article, even though you say it doesn't have some exculpatory material that should have been reported. I don't think that that rises to the level to give me the ability to have a jury question on the issue as to *177 whether or not it's clear and convincing ... that the articles were published by the defendant with knowledge of their falsity or reckless disregard, whether they were true or false. I make that conclusion. I don't think it's a jury question.
The judge then stated he would dismiss the complaint with prejudice.
Although the trial judge did state that there was no evidence before him indicating false statements in the article, this finding must be viewed against both the earlier partial summary judgment finding the article to be libelous per se and the malice standard the court was applying. If, after the supplemental fact-finding required by Part I of this opinion, the trial judge again determines that plaintiff was a limited public figure, we can take no issue with the malice determination.[3] Indeed, the Supreme Court has urged trial judges to dispose of such issues on summary judgment motions rather than to force the parties through long and expensive defamation trials. Maressa v. New Jersey Monthly, 89 N.J. 176, 196-198, cert. den. 459 U.S. 907, 103 S.Ct. 211, 74 L.Ed.2d 169 (1982); Kotlikoff v. The Community News, 89 N.J. 62, 67-68 (1982).
If upon remand, however, the trial judge determines that plaintiff was a private figure and thus defendants need only be shown to have been negligent, then as noted earlier he should review the evidence by applying a negligence standard. Sisler v. Courier News, supra, 199 N.J. Super. at 315-316. See also Restatement, Torts, 2d, § 580B at 221-222.

III  Privileged Reporting of 1966 Senate Report
On remand the trial judge should consider that a previous motion judge determined that the statements were libelous per se in that they imputed commission of a crime, dishonesty, fraud or cheating and had reflected adversely on plaintiff's office, business or employment. At no time did the trial judge *178 indicate disagreement with that ruling. Although the trial judge was not bound by the earlier motion judge's decision, the general practice is to avoid relitigation of an issue already determined by another trial judge earlier in the proceedings, unless the occasion demands it. State v. Ortiz, 202 N.J. Super. 233, 243 (App.Div. 1985); State v. Hale, 127 N.J. Super. 407, 410-413 (App.Div. 1974); Nusbaum v. Newark Morning Ledger Co., 86 N.J. Super. 132, 137 (App.Div.), certif. den. 44 N.J. 398 (1965). And cf. R. 4:42-2, pertaining to separable claims within one suit, which expresses the similar proposition that
any order or other form of decision, however designated, which adjudicates less than all the claims shall not terminate the action as to any of the claims, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims.
Unless the prior partial summary judgment is modified or vacated, the trial judge's conclusion that there were no false statements in the article would be tantamount to stating that the article truthfully stated that plaintiff had been accused of crime, dishonesty, fraud, etc. and that such accusation need not have been tempered by any exculpatory material in order to give a fair review of the report of the Senate hearing. But, as the Supreme Court noted in Lawrence v. Bauer Pub. & Print. Ltd., supra, 89 N.J. at 460-462, the issue is not merely whether defendants correctly reported the charges, but rather whether the extended innuendo from the report of the charges was true. Justice Clifford stated: "For the defense [of truth] to apply, however, the truth must be as broad as the defamatory imputation or `sting' of the statement." (at 460). Justice Clifford further noted that both the trial court and the Appellate Division had determined that the defense of truth could not be sustained merely by truthfully reporting investigations or potential charges. See N.J.S.A. 2A:43-1. The Appellate Division in Lawrence noted that
defendants must show that plaintiffs had in fact committed the offenses or that they had been formally charged with criminal conduct or that police or county prosecuting authorities had announced an official investigation of plaintiffs for the offenses described in the articles. [176 N.J. Super., 378, 389-390, quoted at 89 N.J. at 461].
*179 The Supreme Court, did not decide this issue in Lawrence since it determined that plaintiffs were limited public figures and thus the malice standard applied. It nevertheless stated:
There is considerable authority for the proposition that the fact that defendants accurately reported information obtained from another source will not relieve them of liability. Under that analysis the defense of truth does not refer to the truthful republication of a defamatory statement but to the truth of the statement's contents. Restatement, (Second) of Torts § 578, comment b, at 235-36 (1977). Thus, if defendant published that a third person stated that plaintiff has committed a crime, it is not justification that the third party did in fact make that statement. Rogers [v. Courier Post Co.], supra, 2 N.J. [393] at 401-02 [1949]. Defendant must prove that in fact plaintiff committed the crime. See L. Eldridge, Law of Defamation, § 67 at 331 (1978). Similarly, a statement that criminal charges were imminent would be truthful only if such charges were demonstrably impending.
The trial court viewed the statement in this case as imputing to plaintiffs the crimes of forgery and false swearing and therefore imposed on defendants the burden of proving that plaintiffs had actually committed those crimes. A more literal reading of the headline indicates that the correct interpretation may have been that charges of forgery and false swearing were forthcoming. Whether the `truth' defense should be framed in terms of proof that defendants committed the crimes referred to in the article or simply that charges concerning those charges might `loom' is a provocative question we need not decide today, given our holding that plaintiffs were public figures who have not demonstrated the requisite malicious libel by defendants necessary to sustain a libel judgment. [89 N.J. at 461-62].
In the case before us, the earlier summary judgment determination that the article was libelous per se and the trial judge's factual determination that the article was a fair summary of the Senate report lead us to the necessary conclusion that the Senate report in fact imputed the evil noted earlier. Thus, unless there was a privilege protecting defendants, the defense of truth would have to encompass that imputation, namely that plaintiff committed the wrongful acts, not merely that he was charged with them.
We can equate the Senate report with a formal charge of criminal conduct. Such a charge by an official body would call for application of the fair reportage rule, which affords a qualified privilege to publish statements made by public bodies. Pauling v. News Syndicate Company, 335 F.2d 659, 665 (2d Cir.1964); Cresson v. Louisville Courier Journal, 299 F. 487 *180 (6th Cir.1924); and see Prosser & Keeton, Torts (5 ed.) § 115, p. 83 (1984); Restatement, Torts 2d § 611, comment d (1976). Cf. Nusbaum v. Newark Morning Ledger Co., supra, 86 N.J. Super. at 143-44, involving testimony before a Senate Committee, and Swede v. Passaic Daily News, 30 N.J. 320, 332-33 (1959), involving reports of a municipal body. This privilege, however, is qualified. As noted in Swede, it
depends upon the circumstances of the particular case  the situation of the parties, the persons to whom, the circumstances under which, and the manner in which the communication was made ... [i]f the facts are not in dispute, it is the province of the court to determine whether a privilege existed and whether it was lost. If the facts are in dispute, the jury is called upon to consider those issues. [at 332].
It is one thing to report upon the current actions of a public body; it is quite another to report on a past action in order to provide background data concerning an individual. Again, the report here falls between two extremes. If a plaintiff was charged with the commission of a crime but was never prosecuted and years later the plaintiff in some completely unrelated matter comes before the public, may the media in describing his involvement in the new matter relate the details of the old charge? Where there is exoneration, of course they may not. See Reilly v. Gillen, 176 N.J. Super. 321, 324 (App.Div. 1980), where a pre-election day distribution by a non-media defendant of a 23 year old newspaper account of a complaint filed against plaintiff politician was held actionable where defendant did not provide the fact that the charges against plaintiff had been withdrawn. But cf. Marcone, supra, 754 F.2d at 1085, involving a plaintiff whose prior indictment had been dismissed where the court stated "[a]lthough the criminal activity, by itself, may not create public-figure status, such activity may, nevertheless, be one element in a mix of factors leading to that classification." Our courts have to date stated only that reports of earlier protected statements retain the privilege so long as they are "necessary background information for the interest public," Swede v. Passaic Daily News, supra, 30 N.J. at 334; see also Nusbaum v. Newark Morning Ledger Co., supra, 36 N.J. Super. *181 at 151. Where the charge had never been adjudicated or, as here, where the charge never ripened into a formal accusation that could have been adjudicated, must a citizen forever bear the stigma of having been "charged?" Years later must a citizen shun all publicity for fear of revelation of the unsubstantiated "charge?" We think not. On the other hand, where there is a current or recent investigation, appropriately announced by a public body, it is clear that reports may be made, see, e.g., N.J.S.A. 2A:43-1, and where there is established relevance between the current or recent administrative or legislative "charge," and the matter being reported upon, the qualified privilege attending the fair reporting of such data should protect the media. Coleman v. Newark Morning Ledger Co., 29 N.J. 357, 382 (1959); and see Kotlikoff v. The Community News, supra, 89 N.J. at 68, holding that after New York Times and Gertz there is no need to invoke the fair comment privilege to protect expressions of opinions about public figures.
We are remanding this matter to the trial judge and expect that supplemental certifications or testimony that will bear upon these issues may be received. We need not, therefore, determine here whether plaintiff's current or past activities justified the recounting of the charges from the Senate report, already determined to be libelous per se, in describing the AIM conference and the background of plaintiff as an officer of one of the conference's sponsors and a recipient of an award. If the judge finds that the qualified privilege existed, it can be lost if only malice in the use of the material is shown, Swede v. Passaic Daily News, supra, 30 N.J. at 332.[4] While the trial judge may reconsider the malice issue on remand, as *182 noted earlier he initially found no such malice and we take no issue with that finding.
To summarize this second point, the trial judge should determine whether the article correctly reported the charges made by the Senate Committee, notwithstanding the rebutting material urged by plaintiff. If so, he should further determine whether under the circumstances of this case the recounting of the charges in the article fell within the "fair reportage" privilege, in view of the extended innuendo. If he so determines, he may reconsider whether the privilege was lost through any malice plaintiff may have shown to have existed on the part of defendants. By reaching these issues we do not mean to direct the trial court to determine under Part I of this opinion that plaintiff was a private figure, nor do we direct the trial judge, if he in fact finds no false reporting nor breach of the privilege, to reach the issues described in Part I of this opinion, if the matter can be completely disposed of upon the issues discussed in Part II.
The summary judgment in favor of defendants is reversed and this matter is remanded to the Law Division for further proceedings in accordance with this opinion.
NOTES
[1] See, e.g., Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287, 1299-1300 (D.C. Cir.), cert. den. 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980) (president and chief executive officer of nation's second largest consumer cooperative who actively pursued controversial consumer oriented policies); Yiamouyiannis v. Consumers Union of U.S. Inc., 619 F.2d 932, 939 (2d Cir.), cert. den. 449 U.S. 839, 101 S.Ct. 117, 66 L.Ed.2d 46 (1980) (doctor employed by National Health Federation who voluntarily sought wide publicity of his views opposing water fluoridation through television, radio, newspapers, magazines and legislative and judicial testimony).
[2] See, e.g. Bair v. Clark, 397 So.2d 926, 927 (Fla. Dist. Ct. App. 1981) (out-patient coodinator of non-profit drug abuse and alcoholism treatment center); Jadwin v. Minneapolis Star & Tribune Co., 367 N.W.2d 476, 486 (Minn. 1985) (individual organizer of tax free bond fund was a private figure, but the fund itself as a corporate plaintiff was a public figure); A.H. Belo Corp. v. Rayzor, 620 S.W.2d 756, 759 (Tex.Civ.App. 1981) (member of board of trustees of a foundation which solicited donations for a university).
[3] The judge may, of course, reconsider his determination as to malice, if the proofs concerning the other matters before him warrant reopening that issue.
[4] The Restatement, Torts, 2d, § 611 (1976) has eliminated malice as a basis of avoiding this defense, although the initial Restatement contained a condition that the report must have been made without malice. See Prosser & Keeton, Torts (5 ed.) § 115, p. 838 (1984). In any event we are bound by the law as stated in Swede, supra. See Schiavone Const. Co. v. Time, Inc., 735 F.2d 94, 97 (3d Cir.1984).