SMITH, Justice.
Wachovia Bank, N.A., the successor by merger to SouthTrust Bank (“the Bank”), and American Casualty Company[1] appeal from a judgment as a matter of law entered in favor of Jones, Morrison & Wom-ack, P.C., a Georgia law firm (“Jones Morrison” or “the Jones Morrison firm”), and J. Paul Clinton and Stokes & Clinton, P.C.[2] (Clinton and Stokes & Clinton, P.C., are referred to collectively as “Stokes Clinton” or “the Stokes Clinton firm”) (hereinafter all the appellees are sometimes referred to collectively as “the lawyers”). We affirm in part, reverse in part, and remand.

Facts and Procedural History

This appeal is the second round of appellate proceedings in the underlying case. The following factual and procedural background, as stated by the Court of Civil Appeals in SouthTrust Bank v. Jones, Morrison, Womack & Dearing, 939 So.2d 885 (Ala.Civ.App.2005), is relevant here:
“In 1993, [SouthTrust] Bank issued a business credit card to LaCoste Construction Company, Inc. (‘LCCI’), located in Mobile, Alabama. LCCI authorized nine of its employees, including Brewton Neal Greene, to use the credit card. None of the nine employees, including Greene, was a guarantor of the credit-card indebtedness, and none was personally liable for any of the charges made on the credit card. When LCCI failed to make payments on its credit-card account, the Bank employed the Atlanta, Georgia, law firm of Jones, Morrison, Womack & Dearing, P.C. (‘the Jones, Morrison firm’), to collect the debt. The Bank sent the Jones, Morrison firm its file on the LCCI account. The file included a guaranty agreement that named LCCI and Neal Greene as ‘borrowers’ and that was signed by Vincent D. LaCoste as ‘guarantor.’
“Upon receiving the LCCI collection file from the Bank, Saundra Morrison, the office manager at the Jones, Morrison firm, wrote a letter on August 9, 1999, to Sandra Nash, an employee in *670 the Bank’s recovery department, inquiring as follows:
“ ‘Pursuant to your note, the above Company has a personal guarantee. Do we have a guarantee for all nine individual[s] that are signed on the individual accounts or do we just have a personal guarantee on Vincent D. LaCoste? Please advise.’
“On August 23,1999, Sezette Spivey, a legal-accounts representative for the Bank, wrote to Bill Morrison, an attorney in the Jones, Morrison firm, as follows:
“ ‘In response to the letter from your office dated August 9, 1999: Attached you will find a copy of the Guaranty of Payment. If you have any questions, please feel free to call.’
“A document entitled ‘Guaranty of Payment’ enclosed with Spivey’s letter states, in pertinent part, the following:
“ ‘To induce Bank to make a loan or extend credit or make other financial products or services available to La-Coste Construction Co., Inc. — Neal Greene (as hereinafter further defined, called the “Borrower”), Guarantor hereby agrees with Bank as follows:
“ ‘1. This Guaranty is made for the purpose of securing to Borrower, at Guarantor’s request, one or more loans or extensions of credit with ... Bank.... All such loans or other financial products or services now or hereafter provided by Bank to Borrower, and all extensions or renewals of debts or other obligations now or at any time hereafter owing by Borrower to Bank, are made by Bank in reliance on this Guaranty....
“ ‘2. Guarantor jointly and severally if more than one, hereby unconditionally guarantees to Bank the payment and performance by Borrower of all the Guaranteed Obligations (as hereinafter defined).... ’
“LaCoste’s signature on the guaranty agreement is not accompanied by a typewritten version of his name. Spivey knew that the signature was that of LaCoste, but she did not inform the Jones, Morrison firm of that fact. She also did not send the Jones, Morrison firm a copy of the other guaranty agreements, each bearing the name of a different LCCI employee as a ‘borrower’ but containing the signature of the sole guarantor, Vincent D. LaCoste.
“The Jones, Morrison firm associated the Mobile firm of Stokes, Clinton, Fleming & Sherling (‘the Stokes, Clinton firm’) to file suit on the debt, and it provided that firm with a copy of the Bank’s file, including the guaranty agreement signed by Vincent LaCoste and bearing Neal Greene’s name as a ‘borrower.’ The Stokes, Clinton firm prepared a document entitled ‘Statement of Account/Sworn Statement of Claim’ that identified the Bank as ‘creditor’ and LCCI and Greene as ‘debtor’ (singular). The Stokes, Clinton firm sent the statement to the Jones, Morrison firm on January 19, 2000; the Jones, Morrison firm forwarded the statement to Nancy Tray, a supervisor in the Bank’s recovery department, with the following cover letter from Linda Seymour, who identified herself as a ‘legal representative’ of the Jones, Morrison firm:
“ ‘Enclosed please find documents needed to proceed with legal actions. At your earliest convenience please sign, notarize and send back to our office. If there are any questions regarding this matter, please direct all phone calls, faxes, letters, etc. to my attention.’
*671 “Tray signed the document and gave it to Spivey to return to the Jones, Morrison firm. Spivey testified that she saw Greene’s name on the statement but that she did not think it meant that Greene would be a defendant in any lawsuit filed on behalf of the bank to collect the debt.
“On March 3, 2000, the Stokes, Clinton firm filed a complaint in the Mobile Circuit Court on behalf of the Bank against LCCI and Neal Greene, jointly and individually, but not against Vincent D. LaCoste, seeking a total indebtedness of $50,432.55, plus costs. The complaint contained instructions requesting service on both defendants at 3463 LaCoste Road in Mobile. On March 16, 2000, the service of Greene was returned ‘not found,’ with a sheriffs notation that Greene was ‘no longer employed’ by LCCI. Neither the summons and complaint nor any other motions and pleadings were sent to the Bank.
“On May 10, 2000, the Bank learned that Vincent D. LaCoste had filed Chapter 7 bankruptcy proceedings, and it instructed the Jones, Morrison firm to ‘close the file’ on the LCCI collection matter because of LaCoste’s personal bankruptcy. On May 10 and 11, 2000, Bill Jones, an employee of the Jones, Morrison firm, noted on the firm’s collection history that the file should be closed. On May 18, Spivey made a similar notation on the Bank’s LCCI collection file. On May 31, 2000, Jack Fogel-man, the collection manager at the Jones, Morrison firm, entered a ‘close-file’ memorandum on the firm’s accounts. The close-file instruction, however, was not communicated to the Stokes, Clinton firm.
“On August 14, 2000, Saundra Morrison, the office manager at the Jones, Morrison firm, wrote the following letter to Drew Dorrance in the Bank’s legal-recovery department:
“‘Our co-counsel has been unable to locate Neal Greene for service. Do you wish to serve by publication? The cost is approximately $120.00. Please advise.’
“Spivey testified that the letter was routed to her; she said that on August 23, 2000, she telephoned Jack Fogelman at the Jones, Morrison firm and inquired why any activity was occurring on a file that should have been closed. She did not specifically question why co-counsel was attempting to serve Greene.
“Meanwhile, on August 15, 2000, Paul Clinton of the Stokes, Clinton firm had filed a motion for service by publication on Greene, with a supporting affidavit averring that he had personal knowledge of the fact that Greene had been avoiding service, that Greene had been absent from his residence for more than 30 days since the filing of the complaint, that Greene could not be located, and that service could not be perfected on Greene by any method other than by publication.[3] The Mobile Circuit Court granted the motion on August 18, 2000.
“On October 18, 2000, Saundra Morrison, the office manager at the Jones, Morrison firm, wrote the following letter, marked ‘Att’n: Meg’ to the Stokes, Clinton firm, referencing the ‘[LCCI] account balance with SouthTrust Bank’:
“ ‘Please be advised our client has requested that we close the above debt- or’s file. They do not have adequate *672 documentation to proceed on this case. If you have any questions, please advise.’
“The records of the Stokes, Clinton firm indicate that it received the letter from the Jones, Morrison firm on November 22, 2000. On October 24, 2000, when Greene had not answered or otherwise appeared in the Bank’s action, Clinton requested the entry of default against Greene. On October 30, 2000, the Mobile Circuit Court entered a default judgment for the Bank against Greene in the amount of $50,702.97. The Stokes, Clinton firm recorded the judgment against Green on November 29, 2000.
“At all times material to the Bank’s lawsuit against Greene, Greene was listed in the Mobile telephone directory as ‘B. Neal Greene’ residing at 6602 Cherry Pointe Court in Mobile. On February 21, 2001, Greene was attempting to close a sale of real property when he learned that there was a judgment recorded against him in favor of the Bank. Greene contacted a Bank official who investigated the matter, learned that there was no basis for a judgment against Greene, and instructed the Stokes, Clinton firm to cancel the judgment immediately. The judgment was subsequently set aside, and a summary judgment was entered in favor of Greene on May 11, 2001.
“On June 26, 2001, Greene sued the Bank, but not the lawyers, alleging claims of malicious prosecution, abuse of process, negligence, wantonness, and outrage. On August 28, 2001, counsel for the Bank wrote a letter to Ben Stokes of the Stokes, Clinton firm, stating, in pertinent part:
“ ‘After reviewing a Bank file and the court file in the underlying case [;SouthTrust Bank v. LCCI and Neal Greene ], it seems apparent to us that, if there is liability on the part of SouthTrust (which we have denied), then the ultimate responsibility for that obligation should fall upon the attorneys representing the Bank in suing Mr. Greene and taking a judgment against him.... [I]t seems that we have no alternative but to name your firm, and possibly one or more attorneys in the firm, as third-party defendants for indemnity purposes.’
“In April 2002, the Bank filed a motion for a mediation, allowing the lawyers to participate without being named as third-party defendants in the action. That motion was granted.... [4] On May 31, 2002, the Bank filed a third-party complaint against the lawyers, alleging claims under the Alabama Legal Services Liability Act (‘ALSLA’), § 6-5-570 et seq., Ala.Code 1975, and seeking indemnity for any liability that the Bank might have to Greene.
“Specifically, the Bank alleged (1) that the Jones, Morrison firm had negligently or recklessly breached its duty to examine the documents provided to it by the Bank in order to determine the proper party to sue on the credit-card debt, thereby wrongly causing Greene to be made a defendant when there was no basis for pursuing claims against him individually for the corporate debt of his employer, (2) that the Stokes, Clinton firm had negligently or recklessly caused Greene to be served by publication when, the Bank claimed, a reasonable effort to determine Greene’s home address would have resulted in personal service on Greene, thereby enabling *673 Greene to appear, to argue for, and to obtain a dismissal of the Bank’s lawsuit against him, and (3) that after May 10, 2000, when the Bank instructed the Jones, Morrison firm to ‘close the file’ on the LCCI collection matter, the lawyers breached their duty to the Bank by not immediately dismissing the lawsuit against LCCI and Greene.
“The lawyers filed motions to dismiss the Bank’s third-party complaint.... The trial court denied the motions to dismiss.
“In May 2003, the trial court again ordered mediation, and the parties agreed to hold a mediation on September 24, 2003. The date of the mediation was postponed to October 1, 2003. On July 25, 2003, the circuit court entered a summary judgment for the Bank on all counts of Greene’s complaint except for the malicious prosecution claim. The lawyers moved for a summary judgment on the Bank’s third-party claims and attached supporting briefs, arguing that the Bank was not, as a matter of law, entitled to indemnity from them. The lawyers asserted that, even assuming that they were negligent in suing, serving, and recording a judgment against Greene, the Bank was also negligent in commencing the suit without telling them that Greene was not a guarantor of LCCI’s debt. Accordingly, the lawyers asserted that the parties were joint tort-feasors between whom there could be no right of indemnity. The Bank moved for a summary judgment on its third-party claims against the lawyers, and Greene moved for a summary judgment on his malicious-prosecution claim against the Bank.
“Following a hearing at which the trial court heard arguments of the parties, the trial court, on September 24, 2003, entered a summary judgment for the lawyers on the Bank’s third-party complaint, and denied the motions by the Bank and Greene for a summary judgment. The court did not state the basis for its rulings. Shortly thereafter, the lawyers informed the mediator that they would not attend the mediation. One month later, on the eve of the trial scheduled for Greene’s malicious-prosecution action against the Bank, the Bank settled with Greene for $325,000. The circuit court subsequently dismissed Greene’s complaint. The Bank sought reimbursement from the lawyers for two-thirds of the amount it had paid to settle Greene’s claim, and the lawyers refused to reimburse the Bank for any portion of the settlement with Greene.
“The Bank appealed to the Alabama Supreme Court from the summary judgment in favor of the lawyers on the third-party claims. The supreme court transferred the appeal to [the Court of Civil Appeals], pursuant to § 12-2-7(6), Ala.Code 1975.”
939 So.2d at 889-93 (footnote omitted).
The Court of Civil Appeals reversed the summary judgment entered against the Bank on its third-party claim against the lawyers and remanded the cause to the Mobile Circuit Court. 939 So.2d at 910. This Court initially granted a petition for a writ of certiorari but later quashed the writ as improvidently granted. Ex parte Jones, Morrison, Womack & Dearing, P.C., 939 So.2d 912, 918 (Ala.2006).
On remand, the case proceeded to trial. At the close of the Bank’s case-in-chief, the lawyers moved for a judgment as a matter of law (“JML”). Although the trial court did not enter a separate written order explaining its basis for doing so, the trial court orally granted the motions for a JML. The trial court stated that as to its claims against the lawyers, the Bank had failed to prove by expert testimony the *674 applicable standards of care and that the lawyers had allegedly breached those standards of care. The Bank appeals.

Standard of Review

“When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). The nonmovant must have presented substantial evidence in order to withstand a motion for a JML. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmov-ant and entertains such reasonable inferences as the jury would have been free to draw. Id. Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court’s ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992).”
Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1152 (Ala.2003).

Discussion

I.

As noted in the Court of Civil Appeals’ opinion and as argued by the parties in this appeal, the Bank alleges the following three claims against the lawyers: (1) that the lawyers wrongly identified Greene as a guarantor of the LCCI debt and thereby wrongly caused Greene to be made a defendant in the Bank’s collection action; (2) that after May 10, 2000, when the Bank instructed the Jones Morrison firm to “close the file” on the LCCI collection matter, the lawyers breached their duty to the Bank by not stopping the action to collect the LCCI debt; and (3) that the Stokes Clinton firm negligently or recklessly caused Greene to be served by publication in the collection action.

A.

The Bank’s third-party complaint alleged that its claims against the Stokes Clinton firm are governed by the Alabama Legal Service Liability Act, § 6-5-570 et seq., Ala.Code 1975 (“the ALSLA”); the Stokes Clinton firm does not dispute that the ALSLA applies to the Bank’s claims against it. In addition to asserting claims under the ALSLA as to the Jones Morrison firm, the Bank’s third-party complaint alleged that Jones Morrison had breached its duty of professional care under Georgia law. The complaint also asserted that “if Jones Morrison is not deemed to be a ‘legal service provider’ within the meaning of the [ALSLA], then it is liable to [the Bank] for any of its actions and/or omissions for which [the Bank] may be held liable to Greene.” Among other things, the Jones Morrison firm contends that it is not subject to liability under the ALSLA.
Section 6-5-573 of the ALSLA provides: “There shall be only one form and cause of action against legal service providers in courts in the State of Alabama and it shall be known as the legal service liability action and shall have the meaning as defined herein.” Section 6-5-572(2) of the ALSLA defines “legal service provider” as:
*675 “Anyone licensed to practice law by the State of Alabama or engaged in the practice of law in the State of Alabama. The term legal service provider includes professional corporations, associations, and partnerships and the members of such professional corporations, associations, and partnerships and the persons, firms, or corporations either employed by or performing work or services for the benefit of such professional corporations, associations, and partnerships including, without limitation, law clerks, legal assistants, legal secretaries, investigators, paralegals, and couriers.”
Citing Fogarty v. Parker, Poe, Adams & Bernstein, LLP, 961 So.2d 784 (Ala.2006), and Alabama Education Ass’n v. Nelson, 770 So.2d 1057 (Ala.2000), Jones Morrison argues that “Alabama’s legal malpractice statute applies only to lawyers who are licensed to practice here.” (Jones Morrison’s brief, p. 43.) Jones Morrison contends that because its attorneys were not licensed to practice in Alabama, it was not acting as a “legal service provider” under the circumstances of this case.
In Nelson, a former schoolteacher (Nelson) sued the Alabama Education Association (“the AEA”) and a lawyer employed by the AEA (Long). Long had represented Nelson in a legal dispute with her former employer, the Etowah County Board of Education, and Nelson sought to recover damages for Long’s alleged legal malpractice under the ALSLA from both Long and the AEA. 770 So.2d at 1057-58.
This Court held that the AEA was not a “legal service provider” and that the AEA could not, therefore, be held liable under the ALSLA. Specifically, this Court stated:
“Under § 6-5-572(2), a ‘legal service provider’ can be either: (1) a person licensed to practice law in the State of Alabama, or (2) a person engaged in the practice of law in the State of Alabama. Obviously, the AEA is not licensed to practice law in Alabama, so we must consider whether the AEA is ‘engaged in the practice of law,’ within the meaning of § 6-5-572(2).
“In order to ascertain the meaning of a statute, we look first to the plain meaning of the words written by the Legislature. Johnson v. Price, 743 So.2d 436, 438 (Ala.1999). The plain meaning of the words used in § 6-5-572(2) indicates that the Legislature contemplated that the term ‘legal service provider’ would include a professional corporation, association, or partnership itself; the members of a professional corporation, association, or partnership who are licensed to practice law within the State of Alabama; and others not licensed to practice law but who work in .furtherance of the practice of law by a professional corporation, association, or partnership — such as ‘law clerks, legal assistants, legal secretaries, investigators, paralegals, and couriers.’ The members of the AEA are teachers, not lawyers; and the lawyers the AEA hires are not members of the AEA, but, instead, are employees of the AEA. The membership of the AEA does not consist of persons licensed to practice law in the State of Alabama.
“We note that throughout the ALS-LA, the language used by the Legislature indicates that the Act was intended to apply to lawyers and law firms. For example, § 6-5-572(3)(a) sets out the ‘standard of care’ a ‘legal service provider’ is to observe:
“ ‘The standard of care applicable to a legal service provider is that level of such reasonable care, skill, and diligence as other similarly situated legal *676 Service providers in the same general line of practice in the same general locality ordinarily have and exercise in a like case.’
“What standard of care would be applied to the AEA under this statute? We know of no other ‘legal service provider’ that, in regard to the AEA, might be considered to be ‘similarly situated.’ Clearly this section contemplates that the ALSLA is to be applied only to lawyers and to law firms — including professional corporations, associations, and partnerships — whose membership is composed solely of lawyers acting for the purpose of providing legal services.
“The plain language of § 6-5-572(2), as well as that of the other portions of the ALSLA, clearly indicates that the Legislature intended for the ALSLA to apply only to lawyers and to entities that are composed of members who are licensed to practice law within the State of Alabama. Because the AEA is not a lawyer or an entity whose membership is composed of lawyers, it cannot be held hable under the ALSLA.”
770 So.2d at 1058-59.
In Fogarty, South Carolina residents Charles M. Fogarty and Jane C. Fogarty were minority members in three closely held Alabama companies involved in a joint venture in Gulf Shores, Alabama. A North Carolina law firm, Parker, Poe, Adams, and Bernstein, L.L.P. (“Parker Poe”), represented the majority shareholder in the venture, MacPherson Group, Inc., and one of its principals, Gary Southworth. The Fogartys sued Parker Poe, alleging that Parker Poe had engaged in the unauthorized practice of law in Alabama, that Parker Poe had made misrepresentations of law, and that Parker Poe had prevented them from obtaining access to business records of the joint venture. The trial court granted Parker Poe’s motion to dismiss, and the Fogartys appealed.
Among other things, Parker Poe argued that the Fogartys’ “exclusive remedy” was to allege claims under the ALSLA. 961 So.2d at 788. Because the Fogartys had not alleged a claim under the ALSLA, Parker Poe contended that the trial court had properly dismissed the Fogartys’ complaint. In support of its argument that the ALSLA provided the Fogartys’ exclusive remedy, Parker Poe argued (1) that all the Fogartys’ claims arose “solely out of the rendition of legal services by Parker Poe” and (2) that Parker Poe was “engaged in the practice of law in the State of Alabama” and therefore met the definition of a “legal service provider” under the ALSLA. 961 So.2d at 788-89. This Court disagreed.
As to Parker Poe’s argument that it had provided “legal services” to the Fogartys, this Court pointed out that Parker Poe had expressly stated that it had not provided legal services to the Fogartys. This Court noted:
“In Cunningham v. Langston, Frazer, Sweet & Freese, P.A., 727 So.2d 800 (Ala.1999), this Court thoroughly discussed the issue of the applicability of the ALSLA to claims against legal-service providers that do not arise from the performance of legal services. In Cunningham, a lawyer sued a law firm, alleging breach of contract and negligence or wantonness arising out of a fee-splitting arrangement in an underlying case. Cunningham, 727 So.2d at 801-02. After a thorough examination of the language of the entire act, this Court held that ‘the ALSLA does not apply to an action filed against a “legal service provider” by someone whose claim does not arise out of the receipt of legal services.’ Cunningham, 727 So.2d at 804 (emphasis added).
*677 “Counts 7, 8, 10, 11, and 14 of the complaint[5] do not allege tortious conduct resulting from the receipt of legal services by the Fogartys from Parker Poe. Also, Parker Poe, in arguing that no ‘privity’ existed between itself and the Fogartys, expressly states that it never provided legal services to the Fo-gartys. Therefore, it appears that the ALSLA does not apply to the Fogartys’ claims; thus, it cannot be, as Parker Poe asserts, their exclusive remedy.”
961 So.2d at 789 (second emphasis added).
In rejecting Parker Poe’s argument that it was “engaged in the practice of law in the State of Alabama,” this Court stated:
“Furthermore, it appears that the ALSLA applies only to attorneys who are licensed to practice law in Alabama. Parker Poe argues that it was ‘engaged in the practice of law in the State of Alabama’ and, thus, falls under the second prong of the ALSLA’s definition of a legal-service provider. However, this Court has expressly stated that ‘[t]he plain language of § 6-5-572(2), as well as that of the other portions of the ALS-LA, clearly indicates that the Legislature intended for the ALSLA to apply only to lawyers and to entities that are composed of members who are licensed to practice law within the State of Alabama.’ Alabama Educ. Ass’n v. Nelson, 770 So.2d 1057, 1059 (Ala.2000) (emphasis added).
“According to the complaint, Jones and Baron[, two attorneys employed by Parker Poe,] were not licensed to practice law within the State of Alabama, and Parker Poe does not dispute this allegation. Thus, the ALSLA would not apply to the claims against Parker Poe, and the ALSLA could not be the Fogar-tys’ exclusive remedy. The trial court erred, therefore, in granting Parker Poe’s Rule 12(b)(6) motion on Parker Poe’s first stated ground.”
961 So.2d at 789.
We disagree with Jones Morrison’s contention that under Nelson and Fogarty it cannot be held liable under the ALSLA because none of its attorneys were licensed to practice law within the State of Alabama. First, unlike the AEA in Nelson and Parker Poe in Fogarty, Jones Morrison does not dispute that it was providing legal services to the Bank in the present case. Indeed, Jones Morrison’s central argument on appeal is that because it provided legal services to the Bank, the Bank was required to offer expert testimony establishing the applicable standard of care and establishing that Jones Morrison breached that standard.
Second, to provide those legal services to the Bank, Jones Morrison in the present case agreed to perform work or services— such as relaying information between Stokes Clinton and the Bank regarding the legal action to collect the debt — for the benefit of the Stokes Clinton firm in its rendering of legal services to the Bank. Stokes Clinton, as noted, is a legal-service provider under the ALSLA. Thus, unlike Fogarty, in the present case an attorney-client relationship existed between Jones Morrison and the Bank, and in offering legal services to the Bank, Jones Morrison sought the assistance of Stokes Clinton and agreed to perform work for the benefit of Stokes Clinton, itself a “legal-service provider” under the ALSLA. Consequently, the question presented in this case — whether the ALSLA applies to claims against an attorney not licensed in Alabama who, in conjunction with an attorney licensed to practice in Alabama, per *678 forms legal services in Alabama for a client — was not at issue in Fogarty or Nelson. Thus, to the extent that language in Fogarty or Nelson suggests that the ALS-LA could not apply in such a scenario, that language was unnecessary to the holdings in Fogarty and Nelson and is not controlling here.[6]
As the Bank points out, it employed Jones Morrison under a contingency-fee arrangement for the purpose of collecting the credit-card debt owed by LaCoste Construction Company, Inc. (“LCCI”). Jones Morrison in turn associated Stokes Clinton under a contingency-fee arrangement pursuant to which Stokes Clinton was to receive 25% of any recovery and Jones Morrison was to receive 8.33%. Moreover, in addition to the fee arrangement between the law firms, Jones Morrison retained the right to control certain aspects of the representation and litigation, such as relaying communications between the Bank and Stokes Clinton. Thus, the arrangement between Jones Morrison and Stokes Clinton — i.e., a contingency-fee arrangement with Jones Morrison retaining the right to control certain aspects of the representation— was a joint venture to prosecute the Bank’s collection action. See 46 Am. Jur.2d Joint Ventures § 50 (2006), which states:
“[Wjhere an attorney retained on a contingent-fee basis to prosecute a claim engages another lawyer to assist in the litigation, upon an agreement to share the fee in case of success, otherwise to receive nothing, they become joint ven-turers. However, a local counsel hired by an out-of-state counsel to perform certain services is not a joint venturer where the local counsel’s compensation is not contingent upon the successful outcome of the litigation and there is no agreement to share in the profits or losses and the control and management of the litigation being vested in the out-of-town counsel who employed a local counsel to perform limited services for a fixed fee regardless of the results.”
(Footnotes omitted.) As noted, Stokes Clinton is a “legal service provider” under § 6-5-572(2) of the ALSLA because it is a “professional corporation[ ], association ], [or] partnership[ ]” that is “licensed to practice law by the State of Alabama or engaged in the practice of law in the State of Alabama.” In view of its arrangement with the Stokes Clinton firm, Jones Morrison meets that part of the definition of a “legal service provider” that includes “the persons, firms, or corporations either employed by or performing work or services for the benefit of such professional corporations, associations, and partnerships including, without limitation, law clerks, legal assistants, legal secretaries, investigators, paralegals, and couriers” (emphasis added).
The Bank’s above-stated claims against Jones Morrison arise out of the attorney-client relationship that existed between Jones Morrison and the Bank and out of Jones Morrison’s provision of legal services to the Bank.[7] Thus, the ALSLA gov *679 erns the Bank’s claims against Jones Morrison. See § 6-5-573, Ala.Code 1975: “There shall be only one form and cause of action against legal service providers in courts in the State of Alabama and it shall be known as the legal service liability action and shall have the meaning as defined herein.” Moreover, the ALSLA provides the exclusive remedy for the Bank’s above-stated claims against Jones Morrison. See 6-5-572(1), which defines a “legal service liability action” as:
“Any action against a legal service provider in which it is alleged that some injury or damage was caused in whole or in part by the legal service provider’s violation of the standard of care applicable to a legal service provider. A legal service liability action embraces all claims for injuries or damage[ ] or wrongful death whether in contract or in tort and whether based on an intentional or unintentional act or omission. A legal services liability action embraces any form of action in which a litigant may seek legal redress for a wrong or an injury and every legal theory of recovery, whether common law or statutory, available to a litigant in a court in the State of Alabama now or in the future.”
See also Sessions v. Espy, 854 So.2d 515, 522 (Ala.2002) (“From these Code sections [§§ 6-5-573, 6-5-572(2), and 6-5-572(1), Ala.Code 1975], it is clear that the ALSLA applies to all actions against ‘legal service providers’ alleging a breach of their duties in providing legal services. The duty required under the ALSLA may be one undertaken by contract or gratuitously.”).

B.

Having concluded that the ALSLA governs the Bank’s claims against the lawyers, we now determine whether the trial court erred in entering a JML against the Bank on each of those claims. As noted, the trial court held that as to each claim the Bank was required to prove by expert testimony both the applicable standard of care and that the lawyers breached that standard. The Bank recognizes that generally a plaintiff alleging a legal-malpractice claim must prove that claim through expert testimony. See, e.g., Tonsmeire v. AmSouth Bank, 659 So.2d 601, 605 (Ala.1995) (“ ‘Expert testimony is required in order to establish deviation from a standard of care in connection with [an] alleged breach [of an attorney’s standard of care], Ala.Code 1975, § 6-5-580.’ ” (quashing trial court’s order)). The Bank contends, however, that expert testimony was not necessary in the present case because, it says, its claims against the lawyers meet the “common knowledge” exception that this Court recognized in Valentine v. Watters, 896 So.2d 385 (Ala.2004).
In Valentine, this Court held that the ALSLA applied to Linnie Valentine’s legal-malpractice claims against Richard Watters. 896 So.2d at 390-91. See also supra note 7. Valentine had consulted Watters about representing her in litiga *680 tion regarding defective breast implants, and one of her claims was that Watters had misrepresented to her that “he was very familiar with litigation regarding breast implants and that he had represented several clients in breast-implant litigation.” [8] 896 So.2d at 386.
In response to the contention that she had failed to offer expert testimony in support of her claim, Valentine argued
“that her case is analogous to medical-malpractice suits and that the exception applied in those cases to the requirement of expert testimony should also apply to legal-malpractice cases. See Ex parte HealthSouth Corp., 851 So.2d 33, 38 (Ala.2002) (stating that expert testimony is not required in a case ‘ “ ‘where want of skill or lack of care is so apparent ... as to be understood by a layman, and requires only common knowledge and expertise to understand it.’ ” ’ (quoting Tuscaloosa Orthopedic Appliance Co. v. Wyatt, 460 So.2d 156, 161 (Ala.1984))).”
896 So.2d at 391. This Court agreed with Valentine.
This Court noted that the statutory scheme for establishing a legal-malpractice claim is similar to the requirements imposed by the Alabama Medical Liability Act of 1987, §§ 6-5-540 to 6-5-552, Ala. Code 1975 (“the AMLA”), for medical-malpractice claims and that even though neither the ALSLA nor the AMLA includes an express requirement that a plaintiff offer expert testimony in support of his or her claim, generally expert testimony is required. This Court thoroughly examined the exception to the expert-testimony requirement in medical-malpractice actions “ ‘where the want of skill or lack of care is so apparent as to be within the comprehension of the average layman and thus requires only common knowledge and experience to understand it.’ ” 896 So.2d at 392 (quoting Rosemont, Inc. v. Marshall, 481 So.2d 1126, 1129-30 (Ala.1985)). This Court stated:
“Many other jurisdictions recognize a ‘common knowledge’ exception to the requirement that a plaintiff in a legal-malpractice case must present expert testimony. McIntyre v. Rumsey, 80 P.3d 1201 (Kan.Ct.App.2003) (unpublished opinion) (stating that expert testimony is not necessary where the attorney’s breach of duty is so clear and obvious that the determination that the attorney deviated from the standard of care is within the common knowledge of the trier of fact); Dubreuil v. Witt, 80 Conn.App. 410, 418, 835 A.2d 477, 483 (2003) (stating that the exception to the need for expert testimony applies when ‘the defendant’s conduct was such an obvious and gross want of care and skill that the neglect would be clear to the average layperson’); Roberts v. Hutton, 152 Ohio App.3d 412, 423, 787 N.E.2d 1267, 1276 (2003) (‘The only exception to this [expert-testimony] requirement is when the alleged breach of care is so obvious that it can be determined from the ordinary knowledge and experience of laymen.’); Mazuca & Assocs. v. Schumann, 82 S.W.3d 90, 97 (Tex.Ct.App.2002) (‘Expert testimony is not required if the attorney’s lack of care and skill is so obvious that the trier of fact can find negligence as a matter of common knowledge.’); Hall v. Fedor, 349 S.C. *681 169, 561 S.E.2d 654 (S.C.Ct.App.2002) (noting that expert testimony is normally required to establish the applicable standard of care except when the matter is within the common knowledge of laypersons).
“Watters argues, and we agree, that expert testimony is generally required in a legal-malpractice case because a jury that is unfamiliar with the principles of law governing the underlying ease might be incapable of discerning whether a lawyer’s professional conduct falls outside an acceptable standard of care. Generally, an expert may testify when ‘scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue.’ Ala. R. Evid. 702. However, ‘Alabama historically and generally has refused expert testimony or opinion on a subject that is within the understanding of the average layperson.’ Ala. R. Evid. 702, Advisory Committee’s Notes.
[[Image here]]
“We are persuaded by our earlier analyses under the medical-services-liability cases and by other courts’ application of that same kind of analysis to legal-services-liability cases that an exception to the general requirement that a plaintiff present expert testimony in support of a legal-malpractice claim occurs where a legal-service provider’s want of skill or lack of care is so apparent as to be understood by a layperson and requires only common knowledge and experience to understand it....
[[Image here]]
“... Accepting Valentine’s claim that Watters told her that he had represented prior clients in litigation involving breast implants and that he later admitted he had not, we conclude that Valentine is not required to present expert testimony to support her claim that Watters breached the applicable standard of care in misrepresenting his qualifications to her in this manner. We hold that a trier of fact with common knowledge and experience could determine that an attorney’s representation that he or she has had experience in a certain type of litigation, when that representation is not true, violates the standard of care.”
896 So.2d at 393-95.
With the foregoing legal principles in mind, we turn to examining the Bank’s three claims against the lawyers.

1.

The Bank’s first claim, as stated above, is that the lawyers wrongly identified Greene as a guarantor of the LCCI debt and thereby wrongly commenced the collection action against him. Regarding this claim, the Court of Civil Appeals in South-Trust Bank stated:
“In support of their motions for a summary judgment, the lawyers submitted all of their correspondence with the Bank leading up to the commencement of the debt-collection proceeding against Greene. They argued that, with respect to the commencement of the lawsuit against Greene, the Bank was negligent in leading them to believe that Greene was a proper party to be sued. Specifically, the lawyers asserted that the Bank was negligent by failing to tell them that Greene was not a guarantor of LCCI’s credit-card indebtedness and that the signature on the guaranty agreement was not that of Neal Greene, but that of Vincent LaCoste. They presented evidence that the Bank had, but did not send them, eight other guaranty agreements on the LCCI account, each bearing the same signature — that of a sole guarantor — a signature that, the lawyers say, is ‘squiggly’ and difficult to *682 decipher, if not illegible. The lawyers contended that, if they had received multiple guaranty agreements, each bearing the name of a different LCCI employee but the same signature of a sole guarantor, they would have understood that the signature on the one guaranty agreement they had was not Greene’s and that Greene was not, therefore, a guarantor.
“The Bank presented evidence indicating the following in opposition: (1) that the Bank employees never told the lawyers that Greene was a guarantor; (2) that the Bank employees sent the lawyers a guaranty agreement that designated Greene as a ‘borrower,’ not a ‘guarantor’; (3) that the Bank employees knew that LaCoste was a guarantor; (4) that the Bank employees knew the signature of the guarantor was La-Coste’s and not Greene’s; (5) that the lawyers did not inquire about the signature on the guaranty agreement; and (6) that in light of the facts in (1) through (5) above, the Bank employees had no reason to believe that they needed to tell the lawyers that Greene was not a guarantor or that the signature on the guaranty agreement was not Greene’s.
“The lawyers contend that the Bank was also negligent by signing and returning to them for commencement of suit a document entitled ‘Statement of Account/Sworn Statement of Claim’ — a document that identified the Bank as ‘creditor,’ LCCI as ‘debtor,’ and that had Greene’s name typed on the line below ‘LCCI.’ In opposition, the Bank presented evidence indicating that the lawyers did not tell the Bank’s employees who reviewed and signed the ‘Statement of Account/Sworn Statement of Claim’ (and the employees were otherwise unaware) that the import of the document listing LCCI as the ‘debtor’ (singular), with Greene’s name typed below LCCI, would be to make Greene a defendant in the collection suit.
“We hold that, in opposition to the motions for summary judgment, the Bank presented substantial evidence that it was not negligent in its initial dealings with the lawyers leading up to the commencement of the lawsuit against Greene. Lawyers, by virtue of their legal training and experience, possess a greater ability than laymen to discern the legal significance of documents such as the ones at issue here: a guaranty agreement and a ‘Statement of Account/Sworn Statement of Claim.’ See Turner v. Kentucky Bar Ass’n, 980 S.W.2d 560, 563 (Ky.1998) (stating that ‘interpreting] legal documents’ is one of several duties performed by paralegal assistants that must be accomplished ‘under the supervision and direction of a licensed lawyer’); Sisler v. Courier-News Co., 199 N.J.Super. 307, 319, 489 A.2d 704, 710 (App.Div.1985), rev’d on other grounds sub nom. Sisler v. Gannett Co., 104 N.J. 256, 516 A.2d 1083 (1986) (indicating that no rebanee could be placed, as to the interpretation of a mortgage, on the opinion of a county clerk, ‘who [was] not a lawyer and whose duties [did] not include explaining the legal significance of documents’).
“ ‘Perhaps the most fundamental legal skill [a lawyer brings to his representation of a client] consists of determining what kind of legal problems a situation may involve.’ Rule 1.1, Ala. R. Prof. Cond., Comment. ‘Competent handling of a particular matter includes inquiry into and factual analysis of the factual and legal elements of the problem.’ Id.
“ ‘ “It is obvious that the client must rely upon his lawyer to make a reasonable investigation of his case. Likewise, the attorney must accept the obligation to conduct a reasonable *683 investigation in an attempt to find what the true facts are before filing a civil action on behalf of his client.’”
“Hunt v. Dresie, 241 Kan. 647, 656, 740 P.2d 1046, 1053 (1987) (quoting Nelson v. Miller, 227 Kan. 271, 284, 607 P.2d 438,448(1980))....
[[Image here]]
“... [W]e do not decide whether the lawyers or the Bank were negligent in commencing the suit against Greene. We hold only that the Bank, in opposition to the lawyers’ motions for a summary judgment, presented substantial evidence that it was not negligent in commencing the suit.
939 So.2d at 900-02.
As the above discussion from the opinion of the Court of Civil Appeals illustrates, the Bank and the lawyers disagree regarding several events leading up to the lawyers’ decision that Greene was a guarantor to the LCCI debt and therefore that Greene should be named as a defendant in the debt-collection action. At trial, Paul Clinton, a lawyer at Stokes Clinton, testified that after he had determined, based on the guaranty and the other documents the Bank had provided to Jones Morrison, that Greene’s signature appeared on the guaranty, he mailed a sworn statement of account to Jones Morrison on January 19, 2000, to be forwarded to the Bank. Jones Morrison, in turn, mailed the sworn statement to the Bank, and a bank representative signed and returned the form. Clinton testified that once the Bank returned the form, he believed the Bank had authorized and instructed him to sue Greene.[9]
Ultimately, the Bank’s claim turns on whether the lawyers in general, and Clinton in particular, breached the applicable standard of care in prepaying and relying on the “Statement of Account/Sworn Statement of Claim,” which listed “LACOSTE CONSTRUCTION COMPANY, INC.” and “NEAL GREENE” and which the Bank signed and returned to the lawyers. The Bank contends that it was not required to offer expert testimony as to this particular aspect of its claim. We disagree.
Although the Bank strongly disputes the reasonableness of Clinton’s determination that Greene’s signature appeared on the guaranty, that determination is intertwined with questions regarding the reasonableness of the lawyers’ preparation of the sworn statement of account and the reasonableness of the lawyers’ reliance on the sworn statement of account after the Bank signed and returned it.
*684 The preparation of the sworn statement of account and the lawyers’ reliance upon it involved the exercise of professional judgment. Under the circumstances of this case, a determination of whether the sworn statement was correctly prepared and whether the lawyers properly relied upon it as part of the suit-initiation process are matters beyond the common knowledge of the average layperson. Therefore, expert testimony was required to establish the standard of care applicable to the lawyers and whether they deviated from it in preparing the statement and subsequently relying on it after the Bank had signed it. See Tonsmeire, supra; Valentine, supra. As to the Bank’s claim against the lawyers relating to the sworn statement of account, the JML is affirmed.

2.

The Bank’s second claim is that after May 10, 2000, when the Bank instructed the Jones Morrison firm to “close the file” on the LCCI collection matter, the lawyers breached their duty by not stopping the action to collect the LCCI debt.[10] This claim has two components: (a) the Bank alleges that Jones Morrison breached its duty to timely instruct the Stokes Clinton firm to stop the action to collect the LCCI *685 debt after May 10, 2000, when the Bank instructed the Jones Morrison firm to “close the file” on the LCCI collection matter; and (b) the Bank alleges that Stokes Clinton breached its duty to stop the collection action once Jones Morrison finally relayed the Bank’s instructions to close the file.

The Jones Morrison Firm

The Jones Morrison firm does not dispute that it understood the Bank’s instructions to mean that all attempts to collect the debt should stop. Jones Morrison, however, contends that expert testimony was required for the Bank to establish that. Jones Morrison committed legal malpractice by waiting until October 18, 2000, to attempt to notify Stokes Clinton of the Bank’s instructions. Jones Morrison contends:
“This is not a case in which a lawyer totally failed to follow the client’s instructions; rather, the issue is whether Jones Morrison followed those instructions in a timely manner, given that [the Bank] told Jones Morrison to close its file on May 10 and those instructions were not relayed to the Stokes Clinton firm until Jones Morrison’s October 18 letter. The precise question, therefore, is whether the passage of time between May 10 and October 18 amounted to a breach of the standard of care. For purposes of this appeal, the issue is even more specific: whether this passage of time constituted such an obvious, or ‘clear and palpable,’ deviation from the professional standard of care — akin to missing the statute of limitations — that no expert testimony was required to establish it. When this timeliness issue is examined in light of the facts of this case, it is apparent that this case is nothing like Valentine v. Watters or any other case in which a lawyer irretrievably forfeited his client’s rights by missing an established deadline.”
(Jones Morrison’s brief, pp. 30-81.) We disagree.
At trial, Lewis Jones, a partner at Jones Morrison, testified that he, “as an attorney for [the] Bank, had an obligation to communicate” to Stokes Clinton the Bank’s instructions to close the file. Further, Jones testified that the Jones Morrison firm considered the acts of closing the file and notifying Stokes Clinton to do the same to be functions of its support staff. Jones specifically named three people at the firm — none of whom were lawyers— who had authority to telephone Stokes Clinton, without first asking an attorney at the Jones Morrison firm, “and tell them to stand down.” Moreover, Jones testified that the firm “did not have a clue” as to why no telephone call was ever made to notify Stokes Clinton of the Bank’s instruction or why the firm waited until October 18, 2000, to mail a letter relaying the instruction to Stokes Clinton (“the October 18, 2000, letter”).
In contrast to the evidence regarding the exercise of professional judgment involved in preparing the sworn statement of account and the lawyers’ reliance upon that document, the only reason offered by Jones for the more-than-five-month delay in relaying the Bank’s instruction to Stokes Clinton was that it was “an oversight.” He testified:
“Q. Do you have any reason to believe the fact that notice to Stokes Clinton to close the file was not given until October was due to anything other than an oversight?
“A. That’s all it is is an oversight. I have picked through the file, picked through the history. I cannot see any reason that it took us until October to send the letter. It just had to be oversight.”
*686 The evidence in this case therefore does not lead to the conclusion that Jones Morrison’s delay in relaying the instruction to Stokes Clinton involved the exercise of professional judgment; indeed, Jones’s own testimony supports the conclusion that Jones Morrison considered the act of its support staff relaying the Bank’s instruction to Stokes Clinton as not involving the exercise of professional judgment. Consequently, whether Jones Morrison’s delay in relaying the Bank’s instruction to the Stokes Clinton firm amounts to a breach of the standard of care is something that may be determined by the trier of fact without the assistance of expert testimony. In that regard, the Bank’s claim against Jones Morrison for its delay is analogous to the claims against the attorney in Valentine, 896 So.2d at 392, in which this Court, in examining the similarities between establishing a breach of the applicable standard of care under the ALSLA for legal-malpractice actions and under the AMLA for medical-malpractice actions, stated:
“Recently, this Court in Ex parte HealthSouth Corp., [851 So.2d 33 (Ala.2002)], stated that it was obvious that expert testimony was not needed to support a claim that nurses had breached the standard of care in failing to respond to the plaintiff patient’s repeated calls for assistance. 851 So.2d at 39. We stated that ‘[a] jury could use “common knowledge and experience” to determine whether the standard of care was breached in this case, where custodial care, not medical care, is at issue.’ ”
Thus, the trial court erred in entering a JML against the Bank on its claim relating to Jones Morrison’s delay in notifying Stokes Clinton of the Bank’s instruction to close the file.[11]

The Stokes Clinton Firm

As to the Stokes Clinton firm, the Bank claims that Stokes Clinton breached the *687 standard of care in failing to stop the collection action once it finally received the Bank’s instructions to close the file. Specifically, the Bank’s claim focuses on the Stokes Clinton firm’s receipt of the October 18 letter, which stated:
“Please be advised our client has requested that we close the above debtor’s file. They do not have adequate documentation to proceed on this case. If you have any questions, please advise.”
At trial, Clinton testified that the October 18 letter “makes it clear that the client wants the file closed.” Stokes Clinton does not argue that it could have continued to proceed against Greene after receiving the October 18 letter. That is, Stokes Clinton does not contend that it could have, in the exercise of professional judgment, continued to pursue the collection action against Greene after receiving the October 18 letter. Rather, Stokes Clinton argues that it did not receive the October 18 letter until November 22, 2000, and that “[b]y the time [Stokes] Clinton received notice in November 2000 that [the Bank] wanted the file closed, the judgment against Greene had already been entered by the circuit court.” (Stokes Clinton’s brief, p. 14.)
Stokes Clinton’s claim in that regard, however, is controverted by evidence suggesting that, on average, it took from two to seven days for mail to travel from the Jones Morrison firm to the Stokes Clinton firm. In accordance with the standard of review applicable here, the evidence, construed in a light most favorable to the Bank, suggests that the Stokes Clinton firm actually received the October 18 letter as early as October 20, 2000.
If the Stokes Clinton firm indeed received the October 18 letter before October 24, there is evidence to indicate that the Stokes Clinton firm, despite receiving clear instructions from the Bank to close the file, nevertheless proceeded to apply for and obtain a default judgment against Greene, to apply for and obtain a certificate of judgment (“COJ”), and to record that judgment against Greene in the probate court.[12] The Stokes Clinton firm does not address this version of the evidence. Notably, the Stokes Clinton firm does not offer an argument to counter the Bank’s contention that under such a scenario, the Bank was not required to offer expert testimony to prove that Stokes Clinton breached the standard of care in failing to obey the Bank’s instructions, which were clearly stated in the October 18 letter.[13] Accordingly, no expert testi *688 mony was required to establish that Stokes Clinton’s conduct after receiving the October 18 letter — -if indeed it received the letter before October 24 — breached the standard of care.
Thus, the trial court erred in entering a JML against the Bank on its claim that Stokes Clinton breached its duty by not stopping the action to collect the LCCI debt after the Bank had instructed it to “close the file” on the LCCI collection matter.

3.

The Bank’s final claim is that the Stokes Clinton firm negligently or recklessly caused Greene to be served by publication in the collection action. The Bank contends that this claim essentially turns on Paul Clinton’s decision to file, with the motion seeking service of Greene by publication, an affidavit asserting that he had “personal knowledge” that Greene was avoiding service.
In addressing this claim, the Court of Civil Appeals stated:
“The Bank argues that the Stokes, Clinton firm negligently or recklessly caused Greene to be served by publication when a reasonable effort to determine Greene’s home address would have resulted in personal service on Greene, thereby enabling Greene to appear, to argue for, and to obtain a dismissal of the Bank’s lawsuit against him. In support of this allegation, the Bank submitted evidence indicating that the lawyers made only one attempt at personal service on Greene, at 3463 LaCoste Road in Mobile; that the sheriffs return on service was marked ‘not found — -no longer employed by LCCI’; that a simple ‘skip-trace’ search of the Mobile telephone directory would have revealed a ‘B. Neal Greene’[14] residing at 6602 Cherry Point Court in Mobile; and that Paul Clinton’s affidavit in support of the motion for service by publication was not based on personal knowledge or facts that would establish avoidance of service.
“The lawyers submitted no evidence indicating that they had made an effort to find Greene or that they had personal knowledge that Greene was avoiding service.... See generally Rule 4.3(c), Ala. R. Civ. P., Committee Comments on 1977 Complete Revision (stating that ‘more than mere inability to find the defendant is required’ for service by publication because ‘avoidance of service’ implies an ‘element of culpability on the part of the defendant’); and Vaughan v. O’Neal, 736 So.2d 635 (Ala.Civ.App.1999) (holding that a conclusory statement in an affidavit that the defendant was ‘avoiding service,’ without reciting facts to support the conclusion, was insufficient to satisfy the requirements of Rule 4.3(d)(1), Ala. R. Civ. P.).”
SouthTrust Bank, 939 So.2d at 906-07.
The affidavit Clinton submitted with the motion for service by publication stated:
“1. My name is J. Paul Clinton, and I am the attorney of record for the plaintiff. I give this affidavit based upon personal knowledge of the facts herein.
“2. The defendant has been avoiding service. The defendant has been absent from their residence for more than thir *689 ty (80) days since the filing of this complaint and cannot be located. Service cannot be perfected upon the defendant by any method other than publication.”
Rule 4.3(d) states:
“Before service by publication can be made in an action where the identity or residence of a defendant is unknown, or when a defendant has been absent from that defendant’s residence for more than thirty (30) days since the filing of the complaint or where the defendant avoids service, an affidavit of a party or the party’s counsel must be filed with the court averring that service of summons or other process cannot be made because either the residence is unknown to the affiant and cannot with reasonable diligence be ascertained, or, the identity of the defendant is unknown, or, the resident defendant has been absent for more than thirty (30) days since the filing of the complaint, or, the defendant avoids service, averring facts showing such avoidance.”
(Emphasis added.)
The Bank asserts that Clinton testified at trial that the sole reason for his assertion that Greene was avoiding service was Clinton’s inability to find Greene. Consistent with the authority cited by the Court of Civil Appeals, the Bank points out that the mere inability to locate a person does not mean that the person is avoiding service. Thus, the Bank contends that Clinton’s affidavit did not comply with Rule 4.3(d) and that no expert is needed to testify that the affidavit did not comply with Rule 4.3(d).
At trial, Clinton testified that Stokes Clinton had made several unsuccessful attempts to locate and serve Greene. Specifically, Clinton testified:
“We attempted [to serve Greene] by the Sheriffs Office and had been unsuccessful and the certified mail had been unsuccessful. There are only three ways to serve somebody, certified mail, process server or the sheriff, and the only third way left is service by publication. So, we decided that’s what we needed to try to get authority to do, and that’s what they wanted to do.”
Regarding the attempt to serve Greene by certified mail, Clinton testified that
“[i]t was returned unclaimed. It was not returned wrong address. It was not returned ‘they moved.’ It was unclaimed, as if he was there, but he wouldn’t claim it. That’s what our belief was.”
(Emphasis added.) Additionally, Clinton testified that at the time he was attempting to have Greene served in person or by certified mail, his research indicated that a “multi-family dwelling” was located at the address at which he was attempting to have Greene served. Thus, Clinton testified that, based on his research and his unsuccessful attempts to have Greene served, he believed that Greene was avoiding service.
However, regardless of the reasons given at trial by Clinton for his assertion in the affidavit that Greene was avoiding service, the affidavit itself did not state those reasons; instead, it included the bare assertion that Greene was avoiding service but did not “avert ] facts to show such avoidance.” Thus, under Rule 4.3(d) and the authority cited by the Court of Civil Appeals in SouthTrust Bank, supra, Clinton’s affidavit was deficient.
Clinton argues that he exercised professional judgment in determining that Greene was avoiding service; he therefore contends that expert testimony was required to prove the Bank’s claim that he deviated from the standard of care in making that determination. However, Rule 4.3(d) expressly allows “a party or the *690 party’s counsel” to submit an affidavit in support of a motion for service by publication. Moreover, Clinton acknowledged at trial that “the mere inability to locate a person doesn’t mean they are avoiding service.” [15]
Under the particular circumstances of this case, we hold that expert testimony was not required to establish whether Clinton’s determination that Greene was “avoiding service” — and ultimately Clinton’s decision to seek service of Greene by publication — breached the applicable standard of care. Because of Clinton’s failure to comply with the requirements of Rule 4.3(d), Ala. Civ. P., the jury could determine, without the assistance of expert testimony, that Clinton acted negligently or recklessly in seeking to serve Greene by publication. Therefore, the trial court erred in entering a JML against the Bank as to its claim against Stokes Clinton based on Clinton’s decision to seek service of Greene by publication.

II.

On remand after the first appeal, the Bank filed a motion on October 10, 2006, seeking a partial summary judgment. Specifically, the motion sought a summary judgment declaring that “(1) the Bank was potentially liable to Greene and (2) [that] the lawyers’ conduct obligated them to indemnify [.the Bank], subject to proof at trial that the settlement with Greene was reasonable and in good faith.” (Bank’s brief, p. 41.) On May 4, 2007, the trial court entered an order stating, in relevant part:
“[T]he court finds that the Bank’s motion is due to be granted, in part. In proving its claim for indemnity against the lawyers, the Bank will not have to prove that it was actually liable to Neal Greene, but rather that it was potentially liable to Greene for malicious prosecution. The remainder of the Bank’s motion is denied.”
In addition to seeking reversal of the JML in favor of the lawyers, the Bank asks us to reverse the trial court’s denial in part of the above-described motion for a partial summary judgment.
In Beiersdoerfer v. Hilb, Rogal & Hamilton Co., 953 So.2d 1196 (Ala.2006), this *691 Court stated: “ ‘[W]e do not review a trial court’s denial of a summary-judgment motion following a trial on the merits.’ ” 953 So.2d at 1205 (quoting Mitchell v. Folmar & Assocs., LLP, 854 So.2d 1115, 1116 (Ala.2003), and citing Grayson v. Hanson, 843 So.2d 146 (Ala.2002); Superskate, Inc. v. Nolen, 641 So.2d 231, 233 (Ala.1994); and Lind v. United Parcel Serv., Inc., 254 F.3d 1281, 1283-84 (11th Cir.2001)). The Bank contends, however, that the rule stated in Beiersdoerfer does not apply because, the Bank says, it was “deprived of a ‘full trial on the merits’ ” in the present case. (Bank’s brief, p. 44.) We disagree.
The JML in this ease was entered after the Bank had presented at a trial before a jury all the evidence available to it. Therefore, the Bank was not deprived of a full trial on the merits, and the trial court’s earlier partial denial of the Bank’s motion for a partial summary judgment is not reviewable. Beiersdoerfer, supra. See Skach v. Gee, 137 Ill.App.3d 216, 221, 484 N.E.2d 441, 444, 91 Ill.Dec. 882, 885 (1985), in which the Appellate Court of Illinois stated:
“Plaintiffs allege that it was error for the trial court to deny their motion for summary judgment. However, plaintiffs recognize that the denial of a motion for summary judgment is not reviewable on appeal after a trial has been held because any error in denial merges into the subsequent appeal. (Banwart v. Okesson (2d Dist.1980), 83 Ill.App.3d 222, 225, 38 Ill.Dec. 630, 403 N.E.2d 1234.) Plaintiffs argue that the present trial was never completed because the trial court granted Orland’s motion for a directed finding. We disagree. Plaintiffs presented all the evidence available to them. Thus, an evidentiary hearing was held, and the trial court found their evidence insufficient. Therefore, the summary judgment of the trial court is not reviewable. Clark v. Maddux (2d Dist.1983), 118 Ill.App.3d 546, 549-50, 73 Ill.Dec. 930, 454 N.E.2d 1179, appeal denied (1984), 96 Ill.2d 567.” [16]
See also Lind v. United Parcel Serv., Inc., 254 F.3d 1281, 1285-86 (11th Cir.2001):
“ ‘If we were routinely to hear post-trial appeals of summary judgment motion denials, we would provide an unwarranted incentive for trial judges to grant such motions in close cases. The only way for a district court to defuse the ‘bomb’ of a denial’s reversal following what would be a therefore superfluous trial would be to grant the motion, enter an appealable judgment dismissing the complaint, and await the outcome of the appeal. Then, only in the event of reversal, would the court and parties proceed to trial secure in the knowledge that one is necessary.’ ”
(Quoting Pahuta v. Massey-Ferguson, Inc., 170 F.3d 125, 131 (2d Cir.1999).)

III.

During discovery in the underlying case, the lawyers sought testimony and documents from the Bank regarding its internal analysis of its actual or potential liability to Greene, the amount of any such *692 liability, and its decision to settle with Greene. The lawyers sought to depose, the Bank’s former in-house counsel, John Buchanan, whom the Bank had identified as the only bank employee having any knowledge of the evaluation of the Bank’s liability to Greene and its decision to settle his claim. Additionally, the lawyers sought production of American Casualty Company’s file concerning Greene’s claim. The Bank objected to the lawyers’ request to take Buchanan’s deposition, and American Casualty Company objected to the request for the production of its file. The Bank and American Casualty Company asserted that the requested discovery was privileged under the attorney-client and work-product privileges. The trial court upheld the Bank’s and American Casualty’s claims of privilege.
The lawyers then moved for a determination that they were entitled to assert an “adverse inference” against the Bank under Rule 512A(a), Ala. R. Evid. Specifically, the lawyers sought to assert the inference “that the bank and its insurance company settled with Neal Greene because of the bank’s own actual or potential liabilities that are separate and apart from the alleged acts and omissions of the lawyers.” The trial court granted the lawyers’ motion. On appeal, the Bank challenges the trial court’s granting of the motion.
Because the trial court entered a JML at the close of the Bank’s case, our reversal of the JML entered against the Bank as to two of the Bank’s three claims pre-termits consideration of this issue.[17] See generally Atkins v. Lee, 603 So.2d 937, 941 (Ala.1992) (“[A] judgment cannot be reversed on appeal for an error ‘unless ... it should appear that the error complained of has probably injuriously affected substantial rights of the parties.’” (quoting Rule 45, Ala. R.App. P., and citing Snow v. Boykin, 432 So.2d 1210, 1214 (Ala.1983); American Furniture Galleries, Inc. v. McWane, Inc., 477 So.2d 369 (Ala.1985); and Muncher v. Muncher, 509 So.2d 250 (Ala.Civ.App.1987))).

Conclusion

The JML is affirmed as to the Bank’s claim that the lawyers wrongly identified Greene as a guarantor of the LCCI debt and thereby wrongly caused Greene to be made a defendant in the Bank’s collection action; the JML is reversed as to the Bank’s claims (1) that the lawyers breach *693 ed their duty to the Bank by not stopping the action to collect the LCCI debt, and (2) that the Stokes Clinton firm negligently or recklessly caused Greene to be served by publication in the collection action; and the cause is remanded.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
COBB, C.J., and LYONS, WOODALL, PARKER, MURDOCK, and SHAW, JJ., concur.
STUART and BOLIN, JJ., concur in part and dissent in part.

. American Casualty Company, the insurance company for SouthTrust Bank, is a co-appellant with Wachovia; Wachovia and American Casualty filed joint briefs in this appeal.

. Stokes & Clinton, P.C., is the successor to Stokes, Clinton, Fleming & Sherling.

. Two previous motions for service by publication had been denied because they each were accompanied by an unsworn affidavit.

. The lawyers did not participate in the mediation, which was unsuccessful. See Ex parte Jones, Morrison, Womack & Dearing, P.C., 939 So.2d 912, 913 (Ala.2006).

. Counts 7, 8, 10, 11, and 14 of the complaint were all the counts applicable to Parker Poe and the only counts this Court considered on appeal. Fogarty, 961 So.2d at 788 & n. 1.

. We have not been asked to overrule Fogarty or Nelson; however, overruling those decisions in this appeal would be unnecessary because the question presented in this case was not presented in Fogarty or Nelson.

. Cf. Valentine v. Watters, 896 So.2d 385 (Ala.2004), in which this Court held that the ALS-LA applied to a plaintiff's claim that an attorney, at the plaintiff's initial consultation, had misrepresented his level of expertise. In support of her contention that the ALSLA did not apply to that claim, the plaintiff in Valentine argued that when the attorney allegedly made the misrepresentations, she had not yet hired the attorney and they had not yet entered into an attorney-client relationship. This Court rejected that argument and stated:
*679 "The ALSLA applies to any claim originating as the result of the plaintiff's receipt of legal services. Moreover, the ALSLA expressly contemplates that the standard of care applicable to a particular attorney is, in part, based on whether the attorney represents to the community, or publishes,' that he or she is specialized in a particular area of the law. See § 6-5-572(3)b., Ala. Code 1975. An attorney’s representations to a potential client are governed by the ALSLA. The mere existence or nonexistence of an express contract, employment, the payment of legal fees, or the length of the consultation is not determinative of whether a preliminary consultation has matured into an attorney-client relationship. Green v. Montgomery County, 784 F.Supp. 841, 846 (M.D.Ala.1992). Thus, Valentine's misrepresentation claim is governed by the ALSLA.”
896 So.2d at 391.

. Valentine also claimed that Watters had missed the deadline to file paperwork to include Valentine in a class action and that the failure to timely file the paperwork negatively affected Valentine's status in that class action. This Court held that expert testimony was not required to prove that in failing to timely file the paperwork Watters breached the standard of care. 896 So.2d at 394.

. Clinton also offered the following testimony at trial regarding the receipt of the signed statement of account from the Bank:
"There is no more important document because we do not know Neal Greene. We do not know any debtors when they come to our office. Typically we don’t know who they are. So, we send a suit request asking the creditor to swear under oath that this person owes this amount of money. We are going to rely on what they tell us. That’s the significance.
"If we don’t get the suit request, we don't file suit. If we don’t get a sworn affidavit, we don't file suit because we are not going to [sue] somebody that we don’t believe owes the money....”

. In seeking to prove that the lawyers breached the standard of care by not stopping the action against Greene, the Bank is attempting to prove that "the lawyers’ actions amounted to a malicious prosecution” of Greene. SouthTrust Bank, 939 So.2d at 907. The Court of Civil Appeals explained:
"The Bank had the burden of production with respect to whether the lawyers' actions amounted to malicious prosecution. See Ex parte General Motors, [769 So.2d 903 (Ala.1999)]. The elements of a malicious-prosecution cause of action are:
" ‘(1) that the [Bank] instituted a prior judicial proceeding against [Greene]; (2) that in instituting the prior proceeding the [Bank] acted without probable cause and with malice; (3) that the prior proceeding ended in favor of [Greene]; and (4) that [Greene] was damaged as a result of the prior proceeding.’
“Wal-Mart Stores, Inc. v. Goodman, 789 So.2d 166, 174 (Ala.2000).
"The existence of the first, third, and fourth elements is undisputed. The existence of the first part of the second element' — that the Bank sued Greene individually for LCCI's credit-card indebtedness without probable cause to believe he was personally liable for the debt — is also undisputed. ’Where evidence of a lack of probable cause is presented and the facts are not in dispute, a question of law is presented, to be decided by the Court.' Delchamps, Inc. v. Larry, 613 So.2d 1235, 1238 (Ala.1992).
"The dispute between the Bank and the lawyers centers on the second part of the second element of a malicious-prosecution claim: namely, malice. For that element, the Bank had the burden of submitting evidence that would have entitled Greene to a JML if the proof had not been controverted at trial, i.e., that the Bank, or agents acting on its behalf, commenced or continued a debt-collection proceeding against Greene with malice.
" 'Malice is an inference of fact and may be inferred from the lack of probable cause or from mere wantonness or carelessness. Personal ill will or a desire for revenge is not essential to the existence of malice.'
“Delchamps, Inc. v. Larry, 613 So.2d at 1239 (citation omitted). We have already determined that there was no probable cause for the Bank’s lawsuit against Greene. We have also decided that there is a disputed question of material fact as to whether the Bank — based on its own conduct or the conduct of its lawyers — was negligent in commencing that lawsuit. Even if that question of fact were resolved by finding the Bank negligent, an inference of malice could not be drawn from that finding of negligence alone because the good faith of the Bank or the lawyers might be a defense. See Delchamps, Inc. v. Bryant, 738 So.2d 824 (Ala.1999); Wal-Mart Stores, Inc. v. Goodman, supra. Nevertheless, ‘going forward carelessly or recklessly with previously commenced proceedings after receiving notice of a problem may be inconsistent with good faith.’ Delchamps, Inc. v. Bryant, 738 So.2d at 834 (emphasis added).”
939 So.2d at 907-08.

. Jones Morrison also argues that, based on an average mail time of five days from Jones Morrison to Stokes Clinton, Jones Morrison’s October 18, 2000, letter "was sent in time for Stokes Clinton to dismiss the lawsuit before filing its default application or, at the very least, to withdraw the default application and dismiss the suit before judgment was entered against Greene.” (Jones Morrison's brief, p. 34.) That particular argument, however, depends upon the drawing of inferences in Jones Morrison's favor from the evidence, which is not appropriate for this Court to do in this appeal under the standard governing review of the trial court’s entry of a JML for Jones Morrison. Waddell & Reed, Inc., 875 So.2d at 1152 (“In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw.”).
Additionally, Jones Morrison’s argument about the timing of the October 18, 2000, letter does not fully take into account evidence indicating that by October 18, 2000, Greene had already begun to suffer damage as a result of the continuation of the legal action against him. Specifically, there was evidence indicating that by October 2000 the attempt to serve Greene by publication was causing a reduction in the number of calls to Greene’s construction business, which he asserted caused his gross income and net profits to drop. Greene testified that his "business just flat stopped due to the publication of a lawsuit by [the Bank] against me." He testified further:
"In my industry, in the construction industry, when it shows up in the paper and in the pink slips that a contractor is being sued by his bank or a bank it is like leprosy they will — all hands are off. No one will fool with you because as a whole construction is a risky business anyway. If you are even ... shaky they are not going to do business and trust you with $50 or $100,000 in projects and you have financial problems with a bank. Therefore, you will just dry up unless you find a source. That is basically the word-of-mouth type business that I am, long-time connections in the town. They know the family's name as a contractor — was hurt instantly.”

. Stokes Clinton applied for the default judgment on October 24, 2000; the judgment was entered on October 26, 2000. Stokes Clinton filed for a COJ on November 7, 2000. The circuit clerk prepared a COJ on November 14, 2000, and the COJ was allegedly received by the Stokes Clinton firm on November 21, 2000. On November 29, 2000, the judgment was recorded in the probate office.

. Clinton did testify that if he had received the October 18 letter before October 24, he would not have filed the application for a default judgment. Clinton testified as follows;
“Q. Now, at that time on October 18, 2000, you had yet to file an application for a default judgment; is that right?
[[Image here]]
“A. No. I believe that is correct.
"Q. If you had had that letter in hand before filing the application for default, would you have filed the application for default?
"A. No.
"Q. And that’s because that letter makes it clear you are to stop your collection activities on that file; is that correct?
“A. No.
"Q. No. It makes it clear that the client wants the file closed, doesn’t it?
"A. Right, it does.
"Q. Now, are you telling me that you would operate in opposition to your client on such an instruction?
*688 "A. No, I would not. But I would call and ask them about the letter.
"Q. And you never called SouthTrust Bank and asked them what they meant by that, did you?
“A. I did not.”

. On the guaranty that the Bank mailed to Jones Morrison on August 23, 1999, the "Borrower” was listed as "LaCoste Construction Co., Inc. — Neal Greene.”

. The Bank cites several items of evidence to dispute the reasonableness of Clinton’s belief, such as (1) evidence indicating that Stokes Clinton attempted to locate a different address other than the address at which it attempted to serve Greene by certified mail; and (2) testimony from Edwin Davis, a "skip tracer,” who testified that Stokes Clinton could have undertaken more diligent efforts to locate Greene such as asking the Bank to provide a Social Security number or date of birth for Greene. The Bank also argues, as to Clinton's assertion that his research indicated that a multi-family dwelling was at the address at which he tried to have Greene served, (1) that it was not until June 20, 2000, that Clinton's research indicated the existence of a multi-family dwelling at that address, which was after Stokes Clinton had mailed the statement of account to Jones Morrison to send to the Bank; and (2) that if Clinton believed there to be more than one dwelling at the address, he should have attempted to have Greene served at the other dwelling at that address rather than only "at the main house.” (Bank's reply brief, p. 18.)
The Bank also points out that Clinton filed two unsuccessful motions to have Greene served by publication; although each of the motions was accompanied by an affidavit from Clinton asserting that he believed Greene was avoiding service, the affidavits were unsworn, and the trial court denied the motions. After those motions were denied, Clinton filed a third motion accompanied by a sworn affidavit asserting that Greene was avoiding service. The Bank asserts that the two earlier motions unaccompanied by sworn affidavits indicate an unwillingness on Clinton's part to assert that he believed that Greene was avoiding service.

. The Bank argues that Skach is distinguishable because the "directed finding" was entered in Skach after both sides had presented their evidence at trial. Although it is true that the JML was entered in the present case before the lawyers had presented their evidence in rebuttal to the Bank's evidence, that distinction from Skach is inconsequential. In reaching its conclusion the Skach court relied primarily on the fact that the “[p]laintiffs presented all the evidence available to them.” 137 Ill.App.3d at 221, 484 N.E.2d at 444, 91 Ill.Dec. at 885.

. As noted, the JML is affirmed as to the Bank's claim that the lawyers breached the standard of care in preparing the sworn statement of account and subsequently relying on it after the Bank had signed it. The basis for that affirmance is that the Bank failed to prove the claim by expert testimony. The Bank does not suggest that the trial court's ruling on the lawyers' motion seeking to assert an adverse inference prevented or limited the Bank in its efforts to prove its claim relating to the sworn statement of account. Rather, as to the adverse — inference ruling, the Bank contends:
"Permitting the adverse inference in this case is especially inappropriate because the trial court also ordered that [the Bank] could not offer testimony relating to their analysis, etc., of settlement in support of their claim that it was reasonable. [The Bank] complied with that, and their effort to prove reasonableness has been and will hereafter be solely by showing the jury what the lawyers did, and letting the jury see that $325,000 was reasonable. If they had tried to show their internal analysis for arriving at $325,000, then perhaps there would have been a waiver issue.”
(Bank's reply brief, pp. 34-35.) Thus, the Bank has not argued or demonstrated that any error in the trial court's ruling on the adverse-inference motion would require us to reverse the trial court’s JML as to the Bank's claim regarding the sworn statement of account.

 The Bank pointed out that an August 9, 1999, letter from the office manager at the Jones, Morrison firm to Sandra Nash of the Bank’s recovery department, inquiring whether there was ‘a guarantee for all nine individuals] that are signed on the individual accounts or just ... a personal guarantee on Vincent D. LaCoste?’ demonstrates clearly that the Jones, Morrison firm knew that Vincent D. LaCoste was a guarantor.”